509 S.E.2d 280

**The STATE, Respondent,**

v.

**Aaron HOLLIDAY, Appellant.**

No. 2896.

Court of Appeals of South Carolina.

Heard Sept. 2, 1998.

Decided Nov. 9, 1998.

Rehearing Denied Jan. 30, 1999.

---

Assistant Appellate Defender M. Anne Pearce, of Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles Molony Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, and Senior Assistant Attorney General Norman Mark Rapoport, of Office of the Attorney General, all of Columbia; and Solicitor Joseph J. Watson, of Greenville, for respondent.

CONNOR, Judge:

A jury convicted Aaron Holliday of assault with intent to kill, resisting arrest, illegally carrying a pistol, failure to stop when signaled by law enforcement, and carjacking. On appeal, Holliday argues the State improperly impeached him by commenting on his post-arrest silence. He also alleges the trial court erred in refusing his jury instruction of defense of others. We reverse and remand for a new trial.

## FACTS

Aaron and his brother Jeremy were both convicted for their actions in the early morning hours of December 31, 1995. The

two brothers and the victim, Jerome Vereen, gave conflicting accounts of the night in question. According to Vereen, he left work around midnight and then went home. Vereen tried to "settle down," but could not due to pain in his side. He then went to the Winn–Dixie for some pain medication. He parked his car in the fire lane, left the keys in the car, and went inside. Vereen said he was sure he did not leave his lights on. When Vereen exited the store, he saw Jeremy sitting on the driver's side of his car. Also, a truck had pulled up beside his car. He opened the driver's side door of his car, and the truck sped off. He asked Jeremy what he was doing in his car. Jeremy told Vereen he was merely trying to turn Vereen's lights off. Vereen, convinced Jeremy was actually attempting to steal the car, told Jeremy to slide over. He claimed he intended to take Jeremy to the police station.

Aaron drove up behind Vereen in the truck and began firing at Vereen's car. A bullet pierced the rear window of the car. Vereen stopped and ran and hid on the side of the road. He testified Aaron and Jeremy continued to drive up and down the road looking for him. Vereen then ran to a friend's house and called the police. Deputies John Broecker and John Boyd with the Greenville County Sheriff's Department responded to the call. After hearing Vereen's story, both deputies were initially skeptical.

Shortly thereafter, Deputy Broecker returned to his routine patrol. He saw Aaron and Jeremy in a car matching the description Vereen had given. At that point, Deputy Boyd responded to the radio dispatch and joined Deputy Broecker. The deputies arrested Aaron and Jeremy after a chase and a struggle.

According to the brothers, they rode to the Winn–Dixie in Aaron's truck to buy something to eat and drink. Aaron waited in the truck for Jeremy to go into the store. Jeremy testified he noticed the lights on in Vereen's car, which was parked in the store's fire lane. He reached into the window of the car to turn off the lights. At that point, Vereen came out of the store and demanded to know what Jeremy was doing. Jeremy stated he told Vereen he was only trying to turn the lights off. Vereen told Jeremy he did not believe him and pulled a gun on Jeremy. He then forced Jeremy into the car

and drove away. During the drive, Vereen told Jeremy he was taking him to the police station, but he was going to take him somewhere else first. Jeremy also claimed Vereen used racial slurs such as "cracker" and "white trash."

Aaron testified he saw his brother talking to Vereen and then get into the car. He knew something was amiss because his brother would not leave the store without telling him. Aaron became worried about his brother's safety and began to follow the car, flashing his lights and honking the horn. At that point, Vereen began firing a gun at his truck. Aaron therefore reached for his gun and fired two shots, attempting to hit the tires. One bullet entered the rear window of Vereen's car. Vereen stopped the car and fled the scene on foot while continuing to fire his gun. Jeremy testified he crawled to the driver's side of the car and drove home. Aaron claimed he had been lying down on his seat to avoid getting shot. Once he sat up, his brother was gone. Aaron then met Jeremy at home.

At that point, Jeremy wanted to call the police. Aaron, concerned the police would not believe them, decided it would be best to abandon the car somewhere. Aaron and Jeremy were on their way to a parking lot to abandon the car when the police spotted them. The brothers led the police on a chase before wrecking the car. Jeremy attempted to escape, but was apprehended by Deputy Boyd. Aaron testified he tried to get out of the car and run when Deputy Broecker repeatedly hit him. After a struggle, the officers arrested the brothers and took them to the Greenville County Detention Center.

The morning following their arrest, Aaron and Jeremy appeared before a magistrate for a bond hearing. The magistrate read them their *Miranda*[1] rights. Then, the magistrate asked both Aaron and Jeremy whether they had anything to say. Jeremy stated he was sorry to Deputy Broecker. Deputy Broecker asked Jeremy if he wanted to tell him what happened. Jeremy said he was trying to steal the car, but things got out of hand. Aaron said nothing.

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

## DISCUSSION

Aaron argues the trial court erred in allowing the solicitor to use his post-arrest silence to impeach his testimony at trial.

During an *in camera Jackson v. Denno*[2] hearing, the trial court held Aaron's silence was not admissible at trial. Thereafter, Aaron's counsel asked the court to instruct Deputy Broecker not to refer to Aaron's decision to remain silent. The judge then asked the solicitor, "[t]he fact that the other defendant didn't give a statement you are not going to bring that out?" The solicitor responded, "No, sir."

At trial, the solicitor's cross-examination of Aaron included the following colloquy:

Q. Isn't it true you never told law enforcement this version of your story?

[DEFENSE COUNSEL:] Your Honor, I am going to object to that.

THE COURT: Overruled. Proceed, ma'am.

Q. Thank you, Your Honor. Isn't it true you never told law enforcement this version of the story?

A. I never told them any version, they never gave me a chance.

Q. Isn't it true you never told anyone that has anything to do with your charges and the prosecutorial process until right now?

A. No, ma'am. I tried to talk to Mr. Broecker and I tried to and I have told Mr. Clay Allen, I have told my dad and I have told Ms. Cagle, the Magistrate.

Q. Did you tell my office, me, the person in charge of your case?

[DEFENSE COUNSEL:] Your Honor, if it please the Court, I renew my objection to this line of questioning.

THE COURT: I understand your objections, noted for the record. . . .

Q. Did you ever tell anyone in the prosecution, that would be my side, this story? I understand you have to discuss with your attorney—

---

2. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

A. No, I didn't.

Q. But today is the first time we are hearing this story?

A. Well, this story—I'm not sure, is it? ... As far as I know, yes, ma'am.

Q. You never told anyone?

A. No ma'am.

As a threshold matter, the State argues Aaron failed to preserve this issue for appeal because he failed to make a specific objection, and he failed to move for a mistrial or ask for additional relief.

In order to preserve an error for appellate review, a defendant must make a contemporaneous objection on a specific ground. *State v. Hoffman,* 312 S.C. 386, 440 S.E.2d 869 (1994); *State v. Crowley,* 226 S.C. 472, 85 S.E.2d 714 (1955). In terms of the specific objection, South Carolina Rule of Evidence 103 provides in pertinent part:

(a) **Effect of Erroneous Ruling.** Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

(1) *Objection.* In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context[.]

Rule 103(a)(1), SCRE. "The objection should be sufficiently specific to bring into focus the precise nature of the alleged error so that it can be reasonably understood by the trial judge." *McKissick v. J.F. Cleckley & Co.,* 325 S.C. 327, 344, 479 S.E.2d 67, 75 (Ct.App.1996).

Here, the trial court and the attorneys had previously discussed the impropriety of Deputy Broecker commenting on Aaron's silence. Because of this discussion, the grounds for Aaron's attorney's objection would have been apparent to the trial court. The court even stated it understood Aaron's objections. Moreover, it is clear from earlier portions of the record that the trial court understood the objection. For example, during the solicitor's direct-examination of Deputy Broecker, Aaron's attorney renewed his objection when Deputy Broecker testified the magistrate had given the Holliday brothers their *Miranda* warnings. At that point, the trial

court stated the objection was noted for the record. Because the trial court was aware of the grounds for the objection, Aaron's attorney was not required to reiterate his previous argument. *See Dunn v. Charleston Coca–Cola Bottling Co.,* 311 S.C. 43, 46, 426 S.E.2d 756, 758 (1993) (It is not "incumbent upon defense counsel to harass the judge by parading the issue before him again, by asking for a mistrial.").

■ Additionally, Aaron was not required to move for a mistrial or a new trial in order to preserve this issue for our review. *See State v. Blyther,* 287 S.C. 31, 336 S.E.2d 151 (Ct.App.1985) (A motion for a new trial is not needed for a defendant to preserve an error where the objection that prompted the error was ruled on by the trial court.); *City of Columbia v. Myers,* 278 S.C. 288, 294 S.E.2d 787 (1982) (Once an objection has been overruled, it is not necessary to make a motion for a mistrial or a new trial to preserve an error for appellate review.); *Bowers v. Watkins Carolina Express, Inc.,* 259 S.C. 371, 376, 192 S.E.2d 190, 192 (1972) ("A motion for new trial is not necessary to preserve for review on appeal a question which has been fairly and properly raised in the trial court and passed upon there."). Moreover, contrary to the State's assertion, Aaron did make a motion for a new trial based in part on the reference to Aaron's silence.[3] We find the error is preserved.

■ In addressing the merits of Aaron's argument, our analysis begins with a discussion of the United States Supreme Court decision *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). In *Doyle,* the Court reviewed the consolidated appeals of Jefferson Doyle and Richard Wood. Doyle and Wood were arrested together and charged with selling ten pounds of marijuana to a local narcotics bureau informant. They were given their *Miranda* warnings and made no post-arrest statements about their involvement in the crime. During their separate state criminal trials, Doyle and

---

**3.** Additionally, at the close of the defense's case, Aaron's attorney moved for a directed verdict on the ground the solicitor's cross-examination commented on Aaron's right to remain silent. The trial court denied his motion. The court ruled there was no *Doyle* violation because the solicitor "was speaking in generalities not specifically of the occasion after the *Miranda* warning." However, the court noted Aaron's attorney was protected in the record concerning his objection.

Wood took the witness stand and gave an exculpatory story that they had not previously told to the police or the prosecutor. Both Doyle and Wood alleged the informant had framed them. Over their counsels' objections, Doyle and Wood were cross-examined by the prosecution concerning why they had not told this story to the officer at the time of their arrest.

On appeal, the United States Supreme Court considered the question of whether a state prosecutor may seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story, after receiving *Miranda* warnings at the time of his arrest. *Doyle,* 426 U.S. at 611, 96 S.Ct. 2240. The Court reversed Doyle's and Wood's convictions, holding "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.* at 619, 96 S.Ct. 2240. The Court explained:

> while it is true that *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

*Id.* at 618, 96 S.Ct. 2240.

Our Supreme Court has consistently recognized the significance of *Doyle,* and has stated, "[a]n accused has the right to remain silent and the exercise of that right cannot be used against him. The State cannot, through evidence or the solicitor's argument, comment on the accused's exercise of his right to remain silent." *State v. Smith,* 290 S.C. 393, 394–95, 350 S.E.2d 923, 924 (1986); *see State v. Reid,* 324 S.C. 74, 476 S.E.2d 695 (1996) (It is a violation of due process for the State to permit comment on a defendant's post-arrest silence since the giving of *Miranda* warnings might induce silence by implicitly assuring a defendant his silence will not be used against him.).

Moreover, solicitors have been warned by the Supreme Court as well as this Court against violation of the *Doyle* prohibition. *State v. Myers,* 301 S.C. 251, 391 S.E.2d 551

(1990); *State v. Arther,* 290 S.C. 291, 350 S.E.2d 187 (1986); *State v. Gray,* 304 S.C. 482, 405 S.E.2d 420 (Ct.App.1991).

Turning to the instant case, we find the solicitor's cross-examination was improper. Although some of the solicitor's questions dealt with Aaron's failure to tell his story to anyone before he received his *Miranda* warnings, other questions asking whether he told the solicitor's office or anyone involved in the prosecution clearly implicate the time period following the *Miranda* warnings, up to the point of the trial. Therefore, the solicitor's questions referencing Aaron's silence violated the *Doyle* rule.

We find support for our decision in the United States Supreme Court's post-*Doyle* case, *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). In *Brecht,* the defendant shot and killed his brother-in-law in Wisconsin. Immediately after the shooting, Brecht sped off in his sister's car. After wrecking the automobile in a nearby town, Brecht told a police officer who offered assistance that his sister had called for a tow truck. Brecht then hitched a ride and was eventually apprehended in Minnesota. Brecht was returned to Wisconsin, and thereafter given his *Miranda* warnings.

At his first-degree murder trial, Brecht took the stand and admitted shooting his brother-in-law, but claimed it was an accident. The State disputed Brecht's account of the incident on the basis that Brecht failed to get help for the brother-in-law, fled after the shooting, and lied to the police officer who offered his assistance. Additionally, the State pointed out that Brecht had failed to tell the police officer, the man who offered him a ride, and the arresting officers the shooting was an accident. Over defense counsel's objections, the State also asked Brecht on cross-examination whether he had told anyone at any time before trial that the shooting was an accident. Brecht responded "no." [4] The State additionally made several

---

4. The State's cross-examination of Brecht included the following exchange:

Q. In fact the first time you ever told this story is when you testified here today was it not?
A. You mean the story of actually what happened?
Q. Yes.
A. I knew what happened, I'm just telling it the way it happened, yes, I didn't have a chance to talk to anyone, I didn't want to call

references to Brecht's pre-trial silence during closing argument.

Brecht was convicted and sentenced to life imprisonment. On appeal, the Wisconsin Court of Appeals set aside the conviction on the ground the State's references to Brecht's post-*Miranda* silence violated *Doyle*. The Court of Appeals found the error sufficiently prejudicial to require reversal. The Wisconsin Supreme Court reinstated the conviction, finding the *Doyle* error constituted harmless error. Brecht sought a writ of habeas corpus. The District Court set aside the conviction on the ground the *Doyle* error was not harmless error. The Court of Appeals for the Seventh Circuit reversed. It found the State's references to Brecht's post-*Miranda* silence violated *Doyle*, but concluded the proper harmless error standard for federal habeas review of a trial error was whether the *Doyle* violation "had substantial and injurious effect or influence in determining the jury's verdict," the standard established in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The United States Supreme Court granted *certiorari* to determine the appropriate harmless-error standard for collateral review of a *Doyle* error. *Brecht*, 507 U.S. at 627, 113 S.Ct. 1710.

Before reaching its ultimate decision on the harmless-error standard for collateral review, as distinguished from direct review, the Supreme Court analyzed the threshold question of whether the State's cross-examination of Brecht was improper. The Court unanimously agreed the State's questions and comments violated *Doyle*.[5] *Id.* at 628–29, 640, 96 S.Ct. 2240.

---

somebody from a phone and give up my rights, so I didn't want to talk about it, no sir.

On re-cross examination, the State further inquired:

Q. Did you tell anyone about what had happened in [Wisconsin]?
A. No I did not.

*Brecht*, 507 U.S. at 625–26 n. 2, 113 S.Ct. 1710.

5. Although the Supreme Court unanimously found the State's references to Brecht's post-*Miranda* silence violated *Doyle*, it denied Brecht habeas relief. This result was based on the 5–4 division of the Court concerning the proper harmless-error analysis to be applied to collateral review of a constitutional trial error. Applying the *Kotteakos* standard, the majority concluded the *Doyle* error did not substantially influence the jury's verdict, *i.e.*, the error did not result in "actual prejudice." *Brecht*, 507 U.S. at 637–39, 113 S.Ct. 1710. The majority

The Court noted Brecht first claimed the shooting was an accident when he took the stand at trial. *Id.* at 628, 96 S.Ct. 2240. The Court stated "[i]t was entirely proper—and probative—for the State to impeach [Brecht's] testimony by pointing out that [Brecht] had failed to tell anyone before the time he received his *Miranda* warnings at his arraignment about the shooting being an accident." *Id.* However, the Court found "the State's references to [Brecht's] silence after that point in time, or more generally to [Brecht's] failure to come forward with his version of events at any time before trial . . . crossed the *Doyle* line." *Id.* at 628–29, 96 S.Ct. 2240. The Court reasoned, "it is conceivable that, once [Brecht] had been given his *Miranda* warnings, he decided to stand on his right to remain silent because he believed his silence would not be used against him at trial." *Id.* at 629, 96 S.Ct. 2240.

Like Brecht, Aaron also told his story for the first time at trial. Similarly, the solicitor repeatedly questioned Aaron why he had not told this story until the day of trial. Clearly, these questions referenced Aaron's post-*Miranda* silence and his failure to come forward with his story prior to trial. In light of the Supreme Court's application of *Doyle* in *Brecht,* we find the solicitor's questions in this case improper.

The State, however, argues the questioning was proper because Aaron tried to claim he was never given an opportunity by the police to tell his side of the story. Therefore, his testimony was more believable because he was telling his story at the first available opportunity. We find no merit to this contention.

Neither Aaron nor his defense counsel broached the subject of Aaron's silence or any previous lack of opportunity to tell his story before the solicitor began questioning him concerning his silence. Aaron would not have given his response but for the solicitor's improper questioning. *Cf. United States v. Robinson,* 485 U.S. 25, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988) (where defendant's counsel in closing argument stated the Government had not allowed defendant to explain his side of

---

found the State's references to Brecht's post-*Miranda* silence were infrequent and cumulative to permissible references to Brecht's pre-*Miranda* silence. *Id.* at 639, 113 S.Ct. 1710. Moreover, the State's evidence of guilt was weighty, if not overwhelming. *Id.*

the story, the prosecutor's comment that the defendant "could have taken the stand and explained it to you" did not violate defendant's right against self-incrimination because the prosecutor's reference to the defendant's opportunity to testify was a fair response to a claim made by defendant's counsel); *State v. Kimsey*, 320 S.C. 344, 465 S.E.2d 128 (Ct.App.1995) (where defendant confessed to crime after being given his *Miranda* warnings and then gave a different version of his involvement in the offense at trial, *Doyle* did not apply, and prosecution was permitted to cross-examine defendant to inquire into prior inconsistent statements); *Id.* at 346, 465 S.E.2d at 130 ("[A] defendant who voluntarily speaks after being given *Miranda* warnings has not heeded the admonitions of the government and has not in any way relied on governmental assurances, but to the contrary, has chosen not to remain silent.").

■■ We find the error in cross-examination cannot be deemed harmless here. In order to be harmless, "the record must establish the reference to the defendant's right to silence was a single reference, which was not repeated or alluded to; the solicitor did not tie the defendant's silence directly to his exculpatory story; the exculpatory story was totally implausible; and the evidence of guilt was overwhelming." *State v. Pickens*, 320 S.C. 528, 531, 466 S.E.2d 364, 366 (1996).

During the challenged cross-examination, the solicitor repeatedly referenced Aaron's silence. Moreover, Aaron's story was not totally implausible and the evidence of guilt was not overwhelming. Furthermore, credibility was a crucial issue in the trial given the conflicting version of the events that happened between the Holliday brothers and Vereen.[6] Accordingly, we hold the error was not harmless. *See State v. Gray*, 304 S.C. 482, 405 S.E.2d 420 (Ct.App.1991) (solicitor's cross-examination of defendant for impeachment purposes on defendant's silence after receiving *Miranda* warnings violated the Due Process Clause of the Fourteenth Amendment and could not be considered harmless error where credibility was a central issue in the trial). Therefore, we reverse and remand for a new trial.

---

6. As stated earlier, even the investigating officers did not believe the victim's story in the beginning.

In light of our decision, we need not address Aaron's remaining issue.

**REVERSED AND REMANDED.**

CURETON and STILWELL, JJ., concur.