535 S.E.2d 152

**The STATE, Respondent,**

v.

**James Anthony PRIMUS, Appellant.**

**No. 3214.**

Court of Appeals of South Carolina.

Heard June 5, 2000.

Decided July 10, 2000.

Rehearing Denied Sept. 2, 2000.

594

Chief Attorney Daniel T. Stacey and Assistant Appellate Defender Katherine Carruth Link, both of South Carolina Office of Appellate Defense, of Columbia, for Appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Attorney General Caroline Callison Tiffin and Assistant Attorney General J. Benjamin Aplin, all of Columbia; and Solicitor Walter M. Bailey, of Summerville, for Respondent.

ANDERSON, Judge:

James Anthony Primus was convicted of kidnapping and assault and battery of a high and aggravated nature (ABHAN). He was sentenced to thirty years for kidnapping and ten consecutive years for ABHAN. On appeal, Primus argues the trial court erred in permitting the Assistant Solicitor to comment on Primus' failure to produce evidence in his defense. We reverse.

## FACTS/PROCEDURAL BACKGROUND

Primus was charged with first degree criminal sexual conduct, second degree burglary and kidnapping for events which occurred on July 13, 1997. The State presented evidence that Primus, armed with a rusty and pointed metal object, forced Nikki Scott (Victim) into an abandoned house where he raped her.

The victim testified that on July 12 she saw Primus at a cookout at a gas station in St. George, where the victim drank

about three beers. Around 10:00 p.m., Primus gave the victim a ride from the station to a club in Bowman, where she drank about five or six beers. The victim left the club at 2:00 a.m. and was driven home by her boyfriend. At 4:30 a.m., she left her house "with another person" and returned home before 6:30 a.m.

Around 7:00 a.m. on July 13, Primus drove to the victim's house and invited her to ride with him to his uncle's house. The victim agreed to accompany Primus and voluntarily got into his car. She had known Primus for about seven years and had even been on one date with him in the past.

According to the victim, Primus told her that he was going to get some gas money from his house, but instead drove to an abandoned house and demanded she get out of his car. When the victim refused, Primus threatened her with a pointed, rusty weapon and pulled her out of the car. He pushed the victim inside the house where he ordered her to undress. Primus had begun assaulting her when the victim·"kneed him" and escaped through a window.

Outside the house, the victim attempted to attract the attention of a passing truck but was forced to the ground by Primus. While on the ground, she found a stick which she used against her assailant, "jab[bing]" him in the chest and gouging him in the eye. She then ran naked and bleeding to a nearby house. The victim immediately claimed Primus raped her. She repeated the same story to police and medical personnel. In addition to naming her attacker, the victim described his car as a red convertible which he cranked with a screwdriver instead of a key.

While searching the abandoned house, police found the weapon the victim had described. Her clothing was discovered inside the house where she testified Primus forced her to undress. A broken window matched her description of how she escaped the home. The police uncovered a latent fingerprint matching Primus' right index finger on the inside door-knob of the house.

Hubert and Toni Shieder, who lived at the home where the victim sought help, described her as naked, bleeding, and very upset. The Shieders testified the victim immediately declared she had been raped. Officers found on the Shieders' porch

the stick the victim used to defend herself. The victim's blood was found on the middle of the stick. On one end of the stick, blood consistent with the victim's DNA was found. Blood inconsistent with the victim's DNA but consistent with Primus' DNA was located on the other end of the stick. Because of the limited amount of blood on the stick, there were interpretable results for only two of the eight sites normally tested. Thus, one person in every 174 people would have the same genetic markers found in that blood. The test results "could not exclude James Primus as a donor."

Later on the day of the crimes, police discovered a red convertible abandoned on the side of the highway. The car, which was registered to Primus, had a "punched ignition," which indicated a screwdriver may have been used to crank it. When the police arrested Primus, he had several scratches on his body and a gouge mark on his eye matching the wound the victim said she inflicted on her attacker.

At trial, Primus did not testify or call witnesses, but the State introduced testimony he offered an alibi to police when questioned. Specifically, Primus told police he had eaten breakfast at 7:00 a.m. at a Shoney's restaurant and visited his uncle, Joe Hodges, during the time frame of the alleged crimes. He stayed at his uncle's house about three hours. Primus claimed that after he visited his uncle, his car broke down on the side of the road. He accepted a ride from a stranger into town where he played basketball with a guy he had never met before named David. Primus asserted "this was the first time they ever played basketball together, didn't know him, and didn't know where he lived." Primus explained he received his wounds while playing basketball. As for Primus' car, an officer, who remembered driving in the area at approximately 10:00 a.m. on the morning of the crimes, stated there was no red convertible on the side of the highway.

The record reflects the following exchange occurred during the State's closing argument:

[Assistant Solicitor]: Primus's statement has to admit a few facts when he talked to the police he had to admit a few things, had to come up with some reason. Of course it wasn't because I attacked [Victim] and dragged her into an abandoned house and raped her, no, no, no, no. It was

because I was playing basketball. He also had to admit that he was up all night, he was driving around. He never went to bed. He told you that. He was up and at them all night long that night. We know that was true because he was at [Victim's] house at 6:30 or 7:00 and taking her out to Gum Branch Road and raping her all during this period.

*And the crucial period when Detective Bills told you he was most interested in was this Shoney's and Uncle Joe Hodges' house. Of course, you can't hold the fact that Mr. Primus didn't present any evidence against him, but don't you think that would have made his alibi a lot stronger if Joe Hodges, his own uncle, had come to court and said, oh, he couldn't have been on Gum Branch Road raping this woman because he was at my house in Corey Woods?* (Emphasis Added).

[Defense Counsel]: I have an objection, your Honor. We don't have to bring those people to court, Judge.

The Court: I'll be telling you later on, I give each attorney a lot of leeway in making their summation to you and I'll be telling you the defendant doesn't have to do anything, doesn't have to prove anything, but I'll be explaining more to you later.

Go ahead, Solicitor.

After closing arguments, the trial court charged the jury as to the applicable law, including an instruction on Primus' right not to testify or present evidence in his defense. The jury found Primus guilty of kidnapping and not guilty of second degree burglary. On the charge of first degree criminal sexual conduct, the jury found Primus guilty of the lesser offense of ABHAN.

### ISSUE

Did the trial court err in permitting the Assistant Solicitor to comment on Primus' failure to produce evidence in his defense?

### LAW/ANALYSIS

Primus contends the trial court erred in allowing the Assistant Solicitor to comment on his failure to call witnesses to support the alibi story he told police. Primus avers the

Assistant Solicitor's remarks improperly shifted the burden of proof to him.

## I. STATE'S CLOSING ARGUMENT

 Solicitors must confine their closing arguments to evidence in the record, tailoring comments to the evidence presented and its reasonable inferences. *State v. Woomer*, 277 S.C. 170, 284 S.E.2d 357 (1981); *State v. Linder*, 276 S.C. 304, 278 S.E.2d 335 (1981). Where a defendant presents evidence at trial, the prosecutor may comment on the defendant's failure to present the testimony of seemingly accessible witnesses who are or should be aware of relevant information. *Douglas v. State*, 332 S.C. 67, 504 S.E.2d 307 (1998); *State v. Shackelford*, 228 S.C. 9, 88 S.E.2d 778 (1955).

 However, where the defendant produces no evidence on his behalf, it is improper for the prosecutor to comment on the defendant's failure to call a particular witness. *See State v. Pickens*, 320 S.C. 528, 466 S.E.2d 364 (1996); *State v. Posey*, 269 S.C. 500, 238 S.E.2d 176 (1977). The jury should ordinarily be instructed not to draw inferences from the neglect of a defendant to call witnesses. *Douglas, supra.*

The Court, in *State v. Browning*, 154 S.C. 97, 151 S.E. 233 (1930), explained the principle as follows:

It is true ... that the defendant did not take the stand to deny or explain the evidence adduced against him, and that he did not offer any evidence in his behalf.... The defendant had the constitutional right to adopt these courses if he chose to do so, and neither the lower court nor this Court have the right to punish him for the exercise of either of those rights. And even if the defendant chose to remain silent at his trial, that fact did not reverse the usual rule of the law that the burden of establishing the defendant's guilt still remained on the State.

*Browning*, 154 S.C. at 102, 151 S.E. at 235.

In *State v. Posey, supra*, our Supreme Court was faced with a situation similar to the case at bar. Posey did not testify and presented no witnesses in his behalf at his murder trial. In closing argument, the Solicitor was permitted, over objection, to comment upon the failure of Posey to call an eyewit-

ness to the crime to testify and was allowed to argue that an inference adverse to Posey could be drawn therefrom. On appeal, Posey contended the Solicitor's argument was prejudicial in that it deprived him of the presumption of innocence and his right to rely upon the failure of the State's evidence to prove his guilt beyond a reasonable doubt. In reversing Posey's conviction for murder, the Court explicated:

> The question than [sic] to be decided is whether it was prejudicial error to permit the solicitor to comment, in argument to the jury, upon the failure of appellant to call an eyewitness within his control to testify, where appellant had presented no evidence during the trial. We reverse upon the authority of *State v. Simmons*, 267 S.C. 479, 229 S.E.2d 597 (1976).
>
> In *Simmons*, the defendant did not testify nor present any evidence and the trial judge permitted the solicitor to comment in argument upon the failure of the defendant to produce his wife as a witness. In reversing, this Court pointed out that, while the wife in that case was not an available or compellable witness, the rule, which permitted an adverse inference comment upon the failure of a party to produce a witness exclusively in his control, did not apply to a criminal defendant who introduces no evidence at all....
>
> ....
>
> The solicitor was permitted, in argument, to draw an adverse inference from [Posey's] failure to produce a certain witness. This had the effect of depriving [Posey] of the right to offer no evidence and rely upon the insufficiency of the State's case against him.

*Posey*, 269 S.C. at 503, 238 S.E.2d at 177.

█ It is never permissible for the prosecutor to suggest to the jury that it draw an adverse inference when the defendant fails to present any evidence at trial, since the defendant may let the case go to the jury on the basis that the prosecution did not meet its burden of proof. *Id.* The rule applies only in cases where a defendant fails to present any evidence at all. *Douglas v. State*, 332 S.C. 67, 504 S.E.2d 307 (1998); *State v. Bamberg*, 270 S.C. 77, 240 S.E.2d 639 (1977).

█ An accused is presumed innocent until proven guilty. The burden is upon the State to prove the accused committed

the crime charged. An accused has the right to rely entirely upon this presumption of innocence and the weakness in the State's case against him. He would clearly be deprived of that right if an adverse inference is permitted to be indulged against him because of its exercise. *See State v. Posey,* 269 S.C. 500, 238 S.E.2d 176 (1977).

In the instant case, Primus presented no evidence in his defense. It was thus improper for the Assistant Solicitor to comment on Primus' failure to call his uncle, whom it would seem he could produce at will, as a witness. We take this opportunity to strenuously caution members of the Bar, particularly attorneys for the State, to carefully tailor their arguments within constitutional guidelines and restrictions.

Because the Assistant Solicitor's argument was improper, the trial court erred in allowing it. The court should have sustained defense counsel's objection and immediately issued a curative instruction. Rather than issue a curative instruction, however, the trial court in the present case informed the jury that counsel was permitted "a lot of leeway" in making closing arguments. The judge then exacerbated the problem with the statement "Go ahead, Solicitor," which imparted an air of approval to the prosecutor's comment.

Effectually, the trial judge in the case *sub judice* overruled defense counsel's objection. This was error.

## II. ERROR PRESERVATION

Next, we consider whether the issue was preserved where Primus had neither requested a curative instruction nor moved for a mistrial.

 It is a fundamental principle that a contemporaneous objection is required at trial to properly preserve an error for appellate review. *State v. Hoffman,* 312 S.C. 386, 440 S.E.2d 869 (1994) (to preserve error for appellate review, defendant must make contemporaneous objection on specific ground); *State v. Black,* 319 S.C. 515, 462 S.E.2d 311 (Ct.App. 1995). The proper course to be pursued when counsel makes an improper argument is for opposing counsel to immediately object and to have a record made of the statements or language complained of and to ask the court for a distinct

ruling thereon. *Varnadore v. Nationwide Mut. Ins. Co.*, 289 S.C. 155, 345 S.E.2d 711 (1986); *State v. Williams*, 266 S.C. 325, 223 S.E.2d 38 (1976); *Young v. Warr*, 252 S.C. 179, 165 S.E.2d 797 (1969); *Crocker v. Weathers*, 240 S.C. 412, 126 S.E.2d 335 (1962); *State v. Meehan*, 160 S.C. 111, 158 S.E. 151 (1931); *Hawkins v. Pathology Assocs. of Greenville, et al.*, 330 S.C. 92, 498 S.E.2d 395 (Ct.App.1998); *State v. Black, supra*.

The dichotomy in regard to an error preservation issue as juxtaposed to an alleged improper argument is:

(1) an objection that is *sustained* followed by action or inaction of the trial judge as to a curative instruction; and

(2) an objection that is *overruled*.

### A. Objection Sustained

In the *first scenario*, the cases are legion in holding that *if an appellant objects and the objection is sustained* but he does not move for a curative instruction or request a mistrial, he has received what he asked for and cannot be heard to complain on appeal. *See McKissick v. J.F. Cleckley & Co.*, 325 S.C. 327, 479 S.E.2d 67 (Ct.App.1996). *See also State v. Patterson*, 324 S.C. 5, 482 S.E.2d 760 (1997) (issue concerning propriety of Solicitor's comments in closing argument was not preserved for review where defendant objected, trial court ruled in defendant's favor, and defendant failed to move to strike or request curative instruction). When objection is timely made to improper remarks of counsel, the judge should rule on the objection, give a curative charge to the jury, and instruct offending counsel to desist from improper remarks. *State v. Harry*, 321 S.C. 273, 468 S.E.2d 76 (Ct.App. 1996); *McElveen v. Ferre*, 299 S.C. 377, 385 S.E.2d 39 (Ct. App.1989).

Where a curative instruction is given and the objecting party does not contemporaneously challenge the sufficiency of the corrective charge or move for mistrial, no issue is preserved for review. *See State v. George*, 323 S.C. 496, 476 S.E.2d 903 (1996) (no issue is preserved for appellate review if objecting party accepts judge's ruling and does not contemporaneously make additional objection to sufficiency of curative charge or move for mistrial); *State v. Penland*, 275 S.C. 537, 273 S.E.2d 765 (1981) (defendant's failure to move for mistrial

on grounds of improper argument by State constitutes waiver of issue on appeal); *State v. Harry, supra* (if judge gives curative charge, and initial objecting party is not satisfied with instruction, a further objection and request for further instruction should be made at that time; if objecting party fails to make this additional objection, asserted misconduct of counsel is not preserved for review on appeal); *State v. Moyd,* 321 S.C. 256, 468 S.E.2d 7 (Ct.App.1996) (if objecting party accepts ruling of trial judge and does not contemporaneously object to sufficiency of curative instruction or move for mistrial, error deemed cured and issue not preserved for appellate review); *Kalchthaler v. Workman,* 316 S.C. 499, 502, 450 S.E.2d 621, 622 (Ct.App.1994) ("Because Kalchthaler's lawyer voiced no complaint about the sufficiency of the trial judge's instructions given in response to the objection and because he requested neither additional instructions addressed to the jury nor an admonition addressed to opposing counsel, appellate review of the issues directed at the trial judge's failure to give curative instructions and to admonish opposing counsel is unavailable.").

## B. Objection Overruled

In the *second scenario,* a plethora of cases articulate the rule. *Once an objection has been overruled,* it is *not* necessary to make a motion for mistrial or new trial to preserve an error for appellate review. *City of Columbia v. Myers,* 278 S.C. 288, 294 S.E.2d 787 (1982); *State v. Holliday,* 333 S.C. 332, 509 S.E.2d 280 (Ct.App.1998). *See also Bowers v. Watkins Carolina Express, Inc.,* 259 S.C. 371, 376, 192 S.E.2d 190, 192 (1972) ("When the court, in effect, overruled defendant's objection to the [closing] argument, it would have been futile to move for a mistrial based upon the same objection."); *State v. Williams,* 212 S.C. 110, 116, 46 S.E.2d 665, 668 (1948) ("It is no answer to suggest that appellant should have asked for a mistrial, because due objection having been made and the objection having been overruled, thereby indicating that this line of argument was not considered improper, it is obvious that a motion for a mistrial would have been a futile thing."). So long as the judge had an opportunity to rule on an issue, and did so, it is not incumbent upon defense counsel to harass the judge by parading the issue

before him again by asking for a mistrial. *See Dunn v. Charleston Coca–Cola Bottling Co.,* 311 S.C. 43, 426 S.E.2d 756 (1993); *State v. Higgenbottom,* 337 S.C. 637, 525 S.E.2d 250 (Ct.App.1999); *State v. Liberte,* 336 S.C. 648, 521 S.E.2d 744 (Ct.App.1999); *State v. McDaniel,* 320 S.C. 33, 462 S.E.2d 882 (Ct.App.1995). Counsel shall not attempt to further argue any matter after he has been heard and the ruling of the court has been pronounced. Rule 18(a), SCRCrimP.

In *City of Columbia v. Myers, supra,* the Supreme Court discussed whether the issue of improper closing argument was preserved where defense counsel objected to comments made by the attorney for the City of Columbia, the judge overruled the objection, and defense counsel did not thereafter request a curative instruction or move for a mistrial. The Court articulated:

It is argued however that the issue of improper closing argument by plaintiff's counsel was not preserved for review. It is contended that the failure of defendant's counsel to request a curative instruction, a mistrial or new trial after his objection had been overruled is fatal. This Court has held in *Bowers v. Watkins Carolina Express, Inc.,* 259 S.C. 371, 376, 192 S.E.2d 190, that motions for mistrial or new trial in such circumstances would be futile and are not necessary to preserve a timely objection for review. By the same logic it would be both futile and nonsensical for counsel to request curative instructions from a trial court which has already ruled an argument to be proper. This appeal is clearly governed by *Bowers, supra,* and cannot in fact be dismissed without implicitly abandoning that case as precedent.

*City of Columbia v. Myers,* 278 S.C. at 289, 294 S.E.2d at 788.

■ We address the trial occurrences with specificity in order to remove the obfuscation that is extant in this area of the law. In the field of error preservation, logic and consistency are not the best of friends. This case is the quintessential illustration of the *second scenario* rule. A specific objection was timely made by defense counsel which was effectively overruled by the trial judge's statement, "Go ahead, Solicitor." Because the court overruled Primus' objection to the improper

closing argument, it was not necessary for Primus to move for mistrial in order to preserve the issue for our review.

## III. EFFICACY OF GENERAL CHARGE

 The State claims the trial court's jury charge on the law cured the error. We disagree. The court instructed the jury regarding the State's burden to prove a defendant's guilt beyond a reasonable doubt. As to Primus' decision not to testify or present evidence, the court charged:

> Well, what is the law that I need to tell you to apply to the facts that only you can find? Well, in the first place, I told you earlier, I said the defendant did not testify and he did not put up any evidence in this case. And I told you, you can't hold it against him because he's merely exercising one of his constitutional rights, that is not to testify or put up any evidence. So when you go back in your jury room don't even talk about the fact that he did not take the stand or testify, [or] put up any evidence.

Although the instruction constitutes a correct statement of the law, it does not cure the judge's error of permitting the inappropriate comment by the Assistant Solicitor during closing argument. The jury was never informed the Solicitor's remarks were improper. Moreover, the charge on the law does not operate in a reparative vein so as to eliminate the error which occurred during jury argument.

In a case with strikingly similar closing argument language emanating from the Solicitor, the Court enunciated:

> During his closing argument the solicitor stated: "One think [sic] they short me up on is I didn't put these officers up. Well, I tell you one thing, they can call witnesses just like I can. And [Douglas] did call witnesses." Douglas objected, and appellant joined in the motion. The trial judge ruled appellant was entitled to protection under *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). We agree. However, the trial judge, not wanting to exacerbate the situation, refused to give a curative instruction. We hold this was error. *Furthermore, the trial judge's general charge, which was given shortly afterwards, did not cure the error.*

*State v. Pickens,* 320 S.C. 528, 530, 466 S.E.2d 364, 365–66 (1996) (footnote omitted) (emphasis added).

## IV. HARMLESS ERROR ANALYSIS

 Primus maintains the Assistant Solicitor's comments during closing argument were so prejudicial as to warrant a new trial. We agree.

 Improper closing argument does not automatically require reversal of a conviction. *State v. Huggins,* 325 S.C. 103, 481 S.E.2d 114 (1997); *State v. Copeland,* 321 S.C. 318, 468 S.E.2d 620 (1996). A new trial will not be granted unless the prosecutor's comments during closing argument so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Huggins, supra; State v. Coleman,* 301 S.C. 57, 389 S.E.2d 659 (1990). The appellant has the burden of proving he or she did not receive a fair trial because of the improper argument. *State v. Linder,* 276 S.C. 304, 278 S.E.2d 335 (1981). On appeal, this Court will review the alleged impropriety of argument in the context of the entire record. *State v. Woomer,* 277 S.C. 170, 284 S.E.2d 357 (1981). *See also State v. Nathari,* 303 S.C. 188, 399 S.E.2d 597 (Ct.App.1990) (propriety of State's closing argument will be examined in light of entire record).

 The harmless error rule governs improper comments made by a Solicitor during closing argument. *See, e.g., United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (applying harmless error analysis to improper comment by prosecutor during closing argument as to defendant's silence at trial, in violation of the Fifth Amendment Self–Incrimination Clause). "[I]t is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations." *Hasting,* 461 U.S. at 509, 103 S.Ct. at 1980, 76 L.Ed.2d at 106.

 The determination of whether an error is harmless depends on the circumstances of the particular case. *State v. Reeves,* 301 S.C. 191, 391 S.E.2d 241 (1990). No definite rule of law governs this finding. *Id.* Rather, the materiality and prejudicial character of the error must be determined from its

relationship to the entire case. *State v. Mitchell,* 286 S.C. 572, 336 S.E.2d 150 (1985). An error is harmless where it could not reasonably have affected the result of the trial. *Id.*

 When a *Doyle* violation has occurred, we apply a harmless error analysis. *State v. Pickens,* 320 S.C. 528, 466 S.E.2d 364 (1996). Where a review of the entire record establishes the error is harmless beyond a reasonable doubt, the conviction should not be reversed. *Id. To be harmless, the record must establish (1) the reference to the defendant's right to silence was a single reference, which was not repeated or alluded to; (2) the solicitor did not tie the defendant's silence directly to his exculpatory story; (3) the exculpatory story was totally implausible; and (4) the evidence of guilt was overwhelming. Id.*

Primus did not testify and relied upon an alibi defense established through the examination of the State's witnesses. The gist of the alibi defense consisted of four prongs:

(1) Breakfast at Shoney's around 7:00 a.m.;

(2) Visit to his uncle Joe Hodges' house for two to three hours;

(3) Accepted ride with stranger into town after car broke down on side of road; and

(4) Played basketball with another stranger (David) in town.

Here, the Assistant Solicitor's reference to Primus' failure to call his uncle as a witness was a single reference. Yet, Primus' exculpatory story was not totally implausible and the evidence of guilt was not overwhelming. In addition, the State's argument tied Primus' silence directly to his exculpatory story. The Assistant Solicitor's attack on the failure of Primus to call his uncle as a witness goes to the heart of Primus' alibi defense. Through the improper comment, the Assistant Solicitor, in effect, invited the jury to make the very inference the jury is not allowed to make.

An examination of DNA evidence in South Carolina demonstrates with clarity the weakness of the DNA evidence in the present case. A litany of cases reveals the mathematical deficiency of the DNA evidence in this case: *State v. Register,* 323 S.C. 471, 475, 476 S.E.2d 153, 156 (1996) ("The expert . . .

stated that the frequency that this pattern would occur in the population was one in two hundred and fifty million."); *State v. Dinkins*, 319 S.C. 415, 416–17, 462 S.E.2d 59, 59 (1995) ("SLED DNA expert Steve Lambert testified the probability of finding appellant's particular DNA pattern in an unrelated individual selected randomly in South Carolina is one in 2.9 billion in the black population and one in 4.2 billion in the white population."); *State v. Ford*, 301 S.C. 485, 488, 392 S.E.2d 781, 783 (1990) ("Testimony was presented that the combination of DNA fragments found in Ford's DNA would only occur in one out of 23 million North American blacks."); *State v. Hyman*, 322 S.C. 59, 61, 471 S.E.2d 466, 467 (Ct.App. 1996) (a SLED agent, qualified as an expert in the field of DNA forensic analysis, declared "this particular DNA profile would be found among the male Caucasian population selected at random from the state in approximately one out of every 6,700 individuals."); *State v. McFadden*, 318 S.C. 404, 411, 458 S.E.2d 61, 65 (Ct.App.1995) (a microbiologist employed by SLED in the DNA analysis unit stated " 'the probability of selecting an unrelated individual at random from the population having a profile matching Willie McFadden's is approximately one in 710 million blacks and one in 1.7 billion caucasians.' ").

The State's evidence included a DNA presentation concerning Primus. Matt Fitts, SLED's forensic DNA serology expert, testified:

[T]he more DNA sites you look at the more you meet that particular DNA profile, so the higher the statistics are. As I mentioned earlier, the one in 1.1 billion. Since they were only able to obtain, for instance on item 3.1, only two sites of eight, of course the statistics aren't going to be as high, and the statistics that were calculated, again, this is if I went through the population at random to see who would match at those two different DNA sites, the frequency would be calculated as *1 in 174 people, because we're only looking at two different sites.* (Emphasis added).

The DNA frequency match calculated in this case is at the bottom end of a random population analysis. Concomitantly, the State's showing of guilt is not enhanced by the DNA evidence. The probability of the DNA evidentiary statistic in

this case is *de minimis* when juxtaposed to the statistical analysis in *Register*, *Dinkins*, *Ford*, *Hyman*, and *McFadden*.

## CONCLUSION

We rule the Assistant Solicitor's comment during closing argument as to Primus' failure to call his uncle as a witness was improper. Thus, the trial court erred in permitting the remark and not issuing a curative jury instruction. Considering the evidence of Primus' guilt, the plausibility of his exculpatory story, and reviewing the evidentiary record in its entirety, we find the probability of prejudicial error is such as to mandate reversal. We hold the State did *not* present overwhelming evidence of guilt. A harmless error analysis requires reversal. Accordingly, Primus' convictions for kidnapping and ABHAN are

**REVERSED.**

HEARN, C.J., and HUFF, J., concur.