24479

The STATE of South Carolina, Respondent v. Johnnie Kenneth
REGISTER, II, Appellant.

(476 S.E. (2d) 153)

Supreme Court

*John R. McCravy, III,* of *Callison, Dorn, Thomason & Mc-Cravy,* Greenwood; and *Douglas G. Borsich,* of *Hipp & Borsich,* North Charleston, *for Appellant.*

*Attorney General T. Travis Medlock, Chief Deputy Attorney General Donald J. Zelenka, Senior Assistant Attorney General Harold M. Coombs, Jr., Assistant Attorneys General Alexandria B. Skinner* and *Robert F. Daley, Jr.,* Columbia; and *Solicitor Ralph J. Wilson,* Conway, *for Respondent.*

Heard Sept. 20, 1995.

Decided Aug. 12, 1996; Reh. Den. Sept. 19, 1996.

BURNETT, Justice:

Appellant, Johnnie Kenneth Register, II, was convicted of murder, first-degree criminal sexual conduct (CSC), kidnapping, buggery and sodomy. Register received a life sentence for murder, thirty years consecutive for CSC, and five years consecutive for buggery and sodomy. Because the kidnapping resulted in murder, there was no sentence for the kidnapping conviction. We affirm.

## FACTS

On November 17, 1991, two deer hunters found the mutilated body of seventeen-year-old Crystal Faye Todd (Victim) in a ditch on a dirt road in Horry County. The Victim had over thirty different cuts and stabs, seven bruises, and three abrasions. Her throat had been slashed from ear to ear, she had been stabbed in a linear pattern down her chest, and she had been disemboweled. Semen was found in the Victim's mouth, rectum, and vagina, and bruises to her vaginal and rectal areas were consistent with brutal vaginal and anal rape.

The Victim was last seen with a girlfriend in the parking lot of a mall shortly after 11:00 p.m. on November 16, 1991. Although the Victim's car was found in the parking lot of a middle school after the homicide, no one saw her there nor did anyone see her get into another person's car.

Register, who was eighteen years of age at the time of the homicide, was a neighbor and friend of the Victim. On January 13, 1992, he voluntarily gave a statement to South Carolina Law Enforcement Division (SLED) agents relating his knowledge of the Victim's acquaintances, boyfriends, and habits. Register also informed the agents of his whereabouts on the night of the homicide. In addition, Register voluntarily consented to give blood, saliva, head and pubic hair samples, fingerprints, and palm prints.

The undisputed serological evidence established that the Victim and Register were both blood type O. Register's phoscoglucomutate (PGM) subtype was one minus—two plus. The Victim's PGM subtype was one plus—two plus. The semen found in the Victim's vagina was left by a person who had blood type O and PGM subtype of one minus—two plus. Accordingly, the serological evidence verified that the semen found was consistent with Register.

SLED also performed a five-probe analysis of the deoxyribonucleic acid (DNA) found in semen deposited in or on the Victim and compared it with DNA from blood exemplars donated by fifty-two people in the locale, including Register. Each one of the five probes was designed to sample portions of DNA known to be variable within the population as well as to be variable independently of each other. The five probes revealed a nine-band match between Register's DNA and DNA in semen deposited in or on the Victim. An expert testified

that previously the most bands observed to match between two individuals had been three out of nine and, therefore, it was extraordinary to observe a nine-band match of five separate pieces of DNA. The expert further stated that the frequency that this pattern would occur in the population was one in two hundred and fifty million. The serological and DNA matches resulted in the arrest of Register at his place of employment on February 18, 1992.

Before his arrest, Register read and signed the statement which he gave to law enforcement officials on January 13, 1992. The police read Register his *Miranda*[1] rights from a card, and he acknowledged that he understood them. While being transported to the police station, the arrest warrants for CSC and murder were read to him. During this time, Register twice asked to see his mother. Upon arriving at the police station, Register again acknowledged that he understood his rights.

From approximately 10:20 a.m. until 1:30 p.m. the police extensively questioned Register concerning his whereabouts the night of the homicide. During this interrogation, the police falsely told Register that he had been seen with the Victim the night she was murdered and that his tires and shoes matched impressions and prints found at the murder scene. The police informed Register that they had irrefutable DNA evidence against him. They further assured him that the courts and solicitor would be apprised of his cooperation. Nevertheless, Register informed the police that he would not tell them "about it" until he talked with his mother.

The police discontinued the interrogation and went to see Register's mother at her home. She did not return with them to the police station to see her son, but instead wrote the following note: "Ken, I love you. I know where you were at. We know when you left the race track and I know when you got home. I'll stand by you. I love you! Mama." The police returned to the police station at approximately 2:20 p.m. and informed Register that they had seen his mother. The police did not give the note to Register, but instead told him she was upset, she said she loved him, and she wanted him to tell them "what happened that night." The police continued to talk with

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. (2d) 694 (1966).

him about his family and girlfriend, which led to discussing his whereabouts on the night of November 16, 1991. Shortly after 3:00 p.m. on February 18, 1992, Register confessed to the homicide.

When Register refused to allow the police to tape record his verbal confession, the police transcribed it into a written statement. In the meantime, the police readministered each of the *Miranda* rights and provided Register with a written *Miranda* form. After acknowledging his rights by initialing each right individually, Register signed the waiver form at the bottom and received a copy. Register then reviewed the written statement, crossed out an incorrect part, and signed it.

During an *in camera* hearing, the trial judge rejected Register's motion to suppress the DNA evidence concluding that the techniques and procedures used by SLED in this case were those generally accepted in the scientific community. Therefore, the judge determined that he DNA evidence was admissible and the jury could determine what weight to give it. In addition, the trial judge held a *Jackson v. Denno*[2] hearing and, after considering the totality of the circumstances, ruled that Register had freely and voluntarily confessed, that he had been properly advised of and understood his *Miranda* rights, and that he had knowingly and intelligently waived his right to remain silent and to have counsel present with him during custodial questioning.

## ISSUES

I. Was Register's confession improperly admitted?
II. Were the DNA test results improperly admitted?
III. Should Register's conviction be reversed?

## DISCUSSION

### I. *Register's Confession*

#### A. *Sixth Amendment Right to Counsel.*

Register contends that his confession was taken in violation of his Sixth Amendment[3] right to counsel. We disagree.

---

[2] 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed. (2d) 908 (1964).
[3] U.S. CONST. amend VI.

The Sixth Amendment right to counsel attaches when adversarial judicial proceedings have been initiated and at all critical stages. *Compare Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed. (2d) 424 (1977) *with Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed. (2d) 631 (1986). Hence, the right to counsel in judicial proceedings in distinguished from the Fifth Amendment *Miranda-Edwards* right to speak with counsel upon request in a *custodial* setting. *McNeil v. Wisconsin*, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed. (2d) 158 (1991); *State v. Wilder*, 306 S.C. 535, 413 S.E. (2d) 323 (1991). The Sixth Amendment right does not attach simply because the defendant has been arrested or because the investigation has focused on him. *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed. (2d) 374 (1966). Further, the Sixth Amendment right attaches only "post-indictment," at least in the questioning/statement setting. *See Michigan v. Harvey*, 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed. (2d) 293 (1990).

Although Register was arrested and questioned on February 18, 1992, he was not indicted until April 16, 1992. At the time the confession was taken, Register was in a *custodial* setting—judicial proceedings had not been initiated. Accordingly, the Sixth Amendment right to counsel had not attached.

### B. *Fifth Amendment Right to Speak to Counsel.*

Register argues that his Fifth Amendment[4] right to speak to counsel was invoked when he requested to see his mother. Register was an adult when he was arrested. Although a juvenile's request for a parent may be considered when determining the voluntariness of the confession, an adult's request for someone other than an attorney does not invoke a Fifth Amendment right to speak with counsel. *See Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed. (2d) 197 (1979) (request for a third party who in not an attorney does not invoke a Fifth Amendment right to counsel during custodial police interrogation). Because Register did not request *legal* counsel, his Fifth Amendment right to counsel was not violated.

---

[4] U.S. CONST. amend V.

## C. *Fifth Amendment Right to Silence.*

Next, Register asserts that his Fifth Amendment right to silence was invoked when he stated that he was not talking "about it" until he saw his mother. A suspect who makes an inadmissible confession may subsequently waive the Fifth Amendment to remain silent, and his later, validly obtained confession will be admissible at trial. *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed. (2d) 222 (1985); *Adams v. Aiken,* 965 F. (2d) 1306 (4th Cir. 1992). The inquiry then becomes whether the second statement was voluntarily made. *Id.*

When Register informed the police that he was not telling them any more "about it" until he spoke with his mother, they ceased the interrogation and went to see Mrs. Register. After the police informed Register of the results of their visit with his mother, they talked with him about his family and girlfriend. He did not request legal counsel or ask to see his mother anew, but instead proceeded to orally confess to the homicide. Moreover, prior to the signing of the written confession, *Miranda* warnings were readministered to Register, he initialed each right individually, and he signed the waiver form. He then reviewed and made corrections to the statement before signing it. Consequently, even if the initial oral confession was improperly obtained, Register was freshly advised of his *Miranda* rights, and he knowingly and voluntarily waived them before signing the confession.

## D. *Voluntariness of Statement.*

Register maintains that he was denied due process of law when the police isolated him and deceived him by telling him that he had been seen with the Victim the night she was murdered, that his tires and shoes matched impressions and prints found at the murder scene, and that they had irrefutable DNA evidence establishing his guilt. He therefore argues that the totality of the circumstances renders his confession involuntary and inadmissible. We disagree.

A statement may be held involuntary if induced by threats or violence, or if obtained by any direct or implied promises, or if obtained by the exertion of improper influence. *State v. Rochester,* 301 S.C. 196, 391 S.E. (2d) 244 (1990). However, this Court and the United States

Supreme Court have held that misrepresentations of evidence by police, although a relevant factor, do not render an otherwise voluntary confession inadmissible. *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed. (2d) 684 (1969) (confession voluntary despite police misrepresentation that associate had confessed); *State v. Rabon*, 275 S.C. 459, 272 S.E. (2d) 634 (1980) (confession voluntary despite police misrepresenting the evidence which had been accumulated). Furthermore, a defendant's will is not overborne when police misrepresent the facts leading him to believe that information of his guilt is greater than it actually is. *Ledbetter v. Edwards*, 35 F. (3d) 1062 (6th Cir. 1994), *cert. denied*, — U.S. —, 115 S.Ct. 2584, 132 L.Ed. (2d) 833 (1995) (defendant's will was not overborne when police misrepresented the evidence convincing him to confess); *State v. Von Dohlen*, — S.C. —, 471 S.E. (2d) 689 (1996) (Davis Adv. Sh. No. 14 at 6) (record failed to establish that defendant's will was overborne by police misrepresentation of evidence rendering his confession involuntary). Although police tactics may influence the suspect's decision to confess, as long as the decision results from the suspect's balancing of competing interests, the confession is voluntary. *Miller v. Fenton*, 796 F. (2d) 598 (3rd Cir.), *cert. denied*, 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed. (2d) 587 (1986).

However, certain circumstances may render an innocent defendant's will to have been overborne resulting in a confession induced by fear of extraneous adverse consequences. In *Lynumn v. Illinois*,[5] police repeatedly misrepresented to the suspect that her government benefits would be eliminated. Thus, the suspect's will was overborne due to her fear of adverse consequences. In *Spano v. New York*,[6] the suspect's will was overborne when he was led to believe that his police officer friend might be fired if he did not cooperate with police. Nevertheless, although a completely innocent defendant might confess in such circumstances, a defendant's will is not overborne merely because he is led to believe that the government's knowledge of his guilt is greater than it actually is. *Ledbetter v. Edwards, supra; State v. Von*

---

[5] 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed. (2d) 922 (1963).
[6] 360 U.S. 315, 3 S.Ct. 1202, 79 L.Ed. (2d) 1265 (1959).

*Dohlen, supra.* Accordingly, the totality of the circumstances must be examined when determining whether the defendant's will was overborne when he confessed. *Ledbetter v. Edwards, supra; Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed. (2d) 854 (1973).

Although the misrepresentation of evidence by police ■ is a deplorable practice, the circumstances in this case do not reveal that Register's will was overborne by police so as to render his confession involuntary. The police did not coerce Register or threaten him with adverse consequences if he did not cooperate. The room where Register was questioned was comfortable, he was not deprived of necessities, and he was repeatedly read his *Miranda* rights. Accordingly, the conditions do not establish that there was an incentive for Register to render a false confession. We therefore conclude that the totality of the circumstances demonstrates that Register, after considering his options, knowingly waived his *Miranda* rights and voluntarily confessed the details of the crime to police. Thus, the second written statement was validly obtained and properly admitted.

## II. *DNA Evidence*

Register contends that a 1992 report published by the National Research Counsel disputes the fact that there is general acceptance of DNA evidence within the scientific community and that several states have since held DNA evidence inadmissible. Therefore, he argues that the trial judge erred in admitting the DNA evidence without holding a *Jones*[7] hearing. We disagree.

DNA print testing and the process of restriction frag-■ ment length polymorphism (RFLP) analysis have been recognized by this Court as reliable and admissible without first holding a *Jones* hearing, subject to attack for relevancy or prejudice. *State v. Ford,* 301 S.C. 485, 392 S.E. (2d) 781 (1990). In order for DNA evidence to be excluded, the trial court must find that it was so tainted as to be totally unreliable. *State v. China,* 312 S.C. 335, 440 S.E. (2d) 382 (Ct. App. 1993).

---

[7] *State v. Jones,* 273, 259 S.E. (2d) 120 (1979) (holding that the admissibility of DNA evidence depends upon whether the experts relied on scientifically and professionally established techniques).

A pretrial hearing was held in which the judge heard ■ extensive testimony from several expert witnesses concerning DNA testing in general and the testing protocol utilized by SLED in this matter. The trial judge determined that when analyzing the DNA in this case, SLED obtained a valid test result after utilizing generally accepted procedures. Therefore, the judge held that challenges to the methods used should be addressed to the weight or probative value of the evidence and not to its admissibility. We agree. The trial judge did not err in admitting the evidence without a *Jones* hearing. *State v. Ford, supra; State v. Bailey,* 276 S.C. 32, 274 S.E. (2d) 913 (1981) (the admission or exclusion of evidence is within the trial judge's discretion).

Next, Register asserts that the method used by SLED in establishing a population database to extrapolate the probability of DNA matches was unreliable and, therefore, the judge erred in admitting evidence which established that it was two hundred and fifty million times more likely that Register left the DNA in the Victim than anyone else. We disagree.

Recently, we have held that population frequency statistics for DNA test results are admissible and are subject to attack for relevancy or prejudice. *State v. Dinkins,* — S.C. —, 462 S.E. (2d) 59 (1995) (Davis Adv. Sh. No. 17 at 3). "The jury should be allowed to make its own determination as to whether it believes the statistics are reliable. The jury is free to believe or disbelieve the experts and the statistics." *Id.* at —, 462 S.E. (2d) at 60. Further, Rule 24(a), SCRCrimP, which is identical to Rule 702, Federal Rules of Evidence, provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

It is debatable whether the "binning" process used by ■ SLED for calculation statistical probabilities has general acceptance in the scientific community. Nevertheless, during the retrial suppression hearing, several experts in the field of statistics and statistical probabilities in DNA calculations testified regarding the reliability of the specific population database developed by SLED in calculating the fre-

quency statistics in this case. Relying upon the material presented and his own research, the judge concluded that the techniques used by SLED in developing the database and in determining the probability of finding Register's particular DNA pattern were based on generally accepted scientific principles. Accordingly, the judge admitted the evidence after determining that the jury, after hearing testimony by the experts, could make its own decision as to the reliability of the statistics. We find no error in its admission.

Next, Register maintains that the trial judge should have granted a continuance to give him time to properly evaluate and analyze the DNA evidence. We disagree.

On September 28, 1992, the State was ordered to provide the computer hard copy of statistical bin frequencies, the SLED protocol manual, and numerous other items. In addition, Register's experts were given permission to visit SLED's headquarters to examine and copy data relating to the DNA evidence. Although Register's trial was to commence on January 11, 1993, his counsel did not visit SLED's headquarters with experts until December 17, 1992, and at that time requested additional information. On December 31, 1992, another discovery hearing was held, and Register moved to suppress the DNA evidence, asserting the need for additional discovery. The judge denied the motion after determining that the State had complied in good faith with the September order by providing Register with all of the information as mandated.

The parties knew in September that the case was set for trial in January and full discovery had been afforded to Register from September forward. The fact that Register's counsel waited until the middle of December to investigate the evidence does not warrant a continuance. Accordingly, we find no abuse of discretion in the trial judge's denial of the motion for a continuance. *State v. White*, 311 S.C. 289, 428 S.E. (2d) 740 (Ct. App. 1993), *citing State v. Tanner*, 299 S.C. 459, 385 S.E. (2d) 832 (1989) (the trial judge's grant or denial of a motion for continuance will not be disturbed absent an abuse of discretion).

### III. *Reversal of Register's Conviction*
Register asserts that his conviction should be reversed be-

cause the *only* evidence against him was the confession and DNA evidence which were improperly admitted. We disagree.

In the preceding discussion, we held that the confession and DNA evidence were properly admitted. Moreover, the record provides additional circumstantial evidence linking Register to the homicide. One of Register's friends testified that Register normally carried an Old-Timer knife, and an expert testified that the Victim's injuries were inflicted by a blade which was the same size as an Old-Timer knife. Register described to third parties the Victim's injuries in sexual terms and revealed details of the crime which only the perpetrator would know. Register mentioned dragging the Victim's body, and there were drag marks from the pool of blood on the dirt road to the Victim's body in the ditch. Also, in spite of the fact that Register thoroughly cleaned his car after the homicide, traces of blood were found on the steering wheel, gear stick, and door handles. Furthermore, Register's accounts of his whereabouts on the night of the homicide were inconsistent. Most importantly, however, is the fact that the serological evidence established that Register's blood, PGM subtype, and secretor status matched semen found in the Victim.

Accordingly, for the forgoing reasons, Register's convictions and sentences are

Affirmed.

TOAL, MOORE and WALLER, JJ., concur.

FINNEY, C.J., dissenting in separate opinion.

FINNEY, Chief Justice, dissenting:

I respectfully dissent from the majority's conclusions that appellant's statement to the police was admissible. In my opinion, the statement must be suppressed as involuntary and obtained in violation of appellant's due process rights.

Police interrogators falsely told appellant they had a witness who disputed his alibi and a witness who has seen appellant and the victim together on the night she was murdered. The police misrepresented to appellant that the tire impressions and footprints found at the crime scene were consistent with appellant's car and shoes. In my view, this deception—coupled with the fact the police ignored the eighteen-year-old

appellant's repeated requests to talk to his mother and misrepresented the result of their visit to his mother so as to inveigle him into giving a confession—renders the confession involuntary and inadmissible as evidence.

The majority acknowledges that police misconduct in misrepresenting evidence is a deplorable practice but, nonetheless, condones the fruits of these acts. I am persuaded that to do so is to commit error. "The countenancing of such conduct can only further erode the public's confidence in law enforcement, and their respect for the justice system. Wherever that fine line between acceptable and unacceptable deceptive police conduct may be, there can be no question that it has been crossed here." *State v. Von Dohlen,* — S.C. —, 471 S.E. (2d) 689 (1996) (Davis Adv. Sh. No. 14 at 6 (Finney, C.J., dissenting). It is my view the police misconduct amounted to coercion and deprived this appellant of a fair and impartial trial. I would hold the trial judge erred in failing to suppress this statement, which was coerced as the result of police fabrication. *See State v. Cayward,* 552 So. (2d) 971 (Fla. App. 2d Dist. 1989) *review dismissed* 562 So. (2d) 347 (Fla. 1990).

I would reverse for the reasons given above.