# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Robert Lee Miller, III, Appellant.

Appellate Case No. 2017-001347

———————

Appeal From Allendale County
R. Lawton McIntosh, Circuit Court Judge

———————

Opinion No. 5824
Heard November 3, 2020 – Filed June 16, 2021

———————

## AFFIRMED

———————

Appellate Defender Susan Barber Hackett, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General W. Jeffery Young, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, Assistant Attorney General Sherrie Butterbaugh, and Assistant Attorney General Mark Reynolds Farthing, all of Columbia; and Solicitor Isaac McDuffie Stone, III, of Bluffton; all for Respondent.

———————

**WILLIAMS, J.:** Robert Lee Miller, III, a juvenile offender, appeals his sentence of fifty-five years' imprisonment for the murder of Willie Johnson (Victim). Miller argues the trial court erred by imposing what amounted to a de facto life sentence,

which he asserts requires a finding of irreparable corruption under *Aiken v. Byars*.[1] Miller also argues the trial court erred in admitting statements he made to officers during a custodial interrogation, contending he did not voluntarily and knowingly waive his *Miranda*[2] rights. We affirm.

## FACTS/PROCEDURAL HISTORY

On June 17, 2014, fifteen-year-old Miller, Miller's older brother, and his brother's friend, Gabriel, broke into Victim's home in Allendale. After asking Victim if he had any sugar, Miller and his accomplices forced their way into his home. The boys knocked Victim to the ground, bound his hands behind his back, robbed him, and ransacked his home. Victim was beaten so badly that his dentures were scattered about the room. Then a plastic bag was placed over his head so he could not look at them. Victim later died in his home with his hands bound and the bag over his head. An expert who conducted Victim's autopsy testified his cause of death was asphyxia from the plastic bag wrapped around his head and stated blunt force trauma was a contributing factor.

On June 24, 2014, Chief Marvin Williams, of the Fairfax Police Department, questioned Miller as a suspect in an unrelated crime that occurred in Fairfax. Before questioning Miller, Chief Williams presented him with a *Miranda* rights acknowledgment and waiver form and asked Miller to read the form to him line-by-line. Chief Williams asked Miller if he understood each right after Miller read them aloud. Miller initialed after each individual right and signed his name at the bottom of the form. Soon after Chief Williams began questioning Miller, Miller stated he did not commit the Fairfax crime, and he thought Chief Williams wanted to question him about Victim's murder. According to Chief Williams, he asked Miller what he was talking about and Miller described his and his accomplices' participation in Victim's murder. Chief Williams and Miller were the only two people in the room during the confession, and Chief Williams did not write a report or summary of the confession, have Miller make a written statement, or record the confession in any manner. Chief Williams testified he did not offer Miller leniency during the interview, did not threaten him, and did not coerce him to confess.

After Chief Williams concluded his interview with Miller, Agents Richard Johnson and Natasha Merrell, both of the South Carolina State Law Enforcement Division

---

[1] 410 S.C. 534, 765 S.E.2d 572 (2014).
[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

(SLED), interrogated Miller about Victim's murder.  The two agents recorded the interview on Agent Merrell's SLED cell phone.  Neither of the agents re-Mirandized Miller before questioning him, and during the first portion of his interview, Miller was accompanied by Tiffany Sabb.  Initially, Agent Johnson explained SLED's role as a state investigative agency and asked Miller about his relationship with Sabb.  Miller stated Sabb was "like a mother to [him]."[3]  Agent Johnson also asked Miller where his mother was, and Miller replied she was at home but he was comfortable speaking to SLED without her.  Agent Johnson clarified Miller was in the eighth grade and that he could read and write by asking Miller to read a certificate that was in the room.  Miller read the first few sentences but could not read the word "contributions" or the cursive portions on the certificate.  Agent Johnson then asked Sabb to leave the room, and when she left, Miller expressed apprehension about talking with Agent Johnson, stating he was more comfortable speaking to Agent Merrell instead.  Agent Johnson replied, "You don't like males?  I intimidate you," and he exited the room after confirming that Miller was willing to talk to Agent Merrell and that Miller understood it was his decision to speak with her.  Miller confirmed that he would talk to Agent Merrell.

When questioned by Agent Merrell, Miller denied any involvement in the murder, stating he was in Fairfax the entire week of the murder until Friday when a bus dropped him off in Allendale.  Miller claimed his neighbor, the school bus driver, could confirm his alibi.  Agent Merrell stated she was there to help Miller and asked him to be honest with her.  She asked Miller if he got a ride from Allendale to Fairfax on the evening of the murder, and Miller explained that he did and that he was in Allendale that day for a school hearing.  When asked how he got back to Fairfax that night, Miller did not answer the question.

Miller then told Agent Merrell how the situation was "crazy" and how acquaintances told him that they heard he kicked Victim's door in and that he held Victim while the other boys beat him.  Agent Merrell asked which story was true, and Miller again denied involvement in Victim's murder.  Agent Merrell asked again about Miller's transportation from Allendale to Fairfax on the day of the murder and whether he could remember what he did between the school hearing and Wednesday morning.  Again, Miller failed to answer the question.  Agent

---

[3] Sabb is the mother of Johnathan Capers, one of Miller's friends from Allendale.  Miller spent a great amount of time with Capers and Sabb, often living with them for weeks at a time.  Both Capers and Sabb gave incriminating statements against Miller before he was interrogated, and both testified at Miller's trial that he confessed to them he murdered Victim.

Merrell then asked Miller about an encounter he had with Allendale police regarding Gabriel, his accomplice.  Miller denied knowing Gabriel, but explained the police wanted to talk to his brother about Gabriel.  Agent Merrell then existed the room and returned with Agent Johnson.

Agent Johnson immediately explained that he and Agent Merrell were trying to help Miller but also told Miller he was going to jail.  Miller asked if he was going to jail that day, and Agent Johnson replied, "Yea, and there ain't nothing we can do to stop it."  Miller replied, "I know."  The colloquy that proceeded is as follows:

>Agent Johnson:  Here's what we want to do is to try and help you on the far end.  Why?  When you're young . . . truth, you're the very first one we're talking to and that's why you getting that break.  Cause in South Carolina, the hands of one is the hands of all.  It doesn't matter which one of you did what, you were there.  That makes you equal.  [Boy], if we charge you with assault and battery, everybody else is going to get charged with assault and battery.
>
>Miller:  Yes, sir. . . .  If they charge me with murder . . . everybody is going to get charged with murder.
>
>. . . .
>
>Agent Johnson:  I'm lazy.  I'm ready to go home.  Alright?  There's this thing that you don't know.  That while you were here, we already got what we need. . . .
>
>Miller:  Can I ask you something?
>
>Agent Johnson:  Yes, sir.
>
>Miller:  How many years I got?
>
>Agent  Johnson: I don't know.  I don't know.  You know what an a** is?  You know what an a** of time is?  That's a lot of time.  You ever hear the prosecutor say an a** of time?

Miller:  So what can I do to get me out of this situation?

Agent  Johnson: You ain't getting out of this, but what you can do is minimize the kind of time.  Look at it this way, alright, I don't know what kind of time you'll get.  I can't tell you that.  I'm not the judge or the lawyer.  But here's what I'm getting at, I'm just throwing some hypothetical numbers out.  Let's say if you were looking at 30 years and because you talked, let's say you tell the truth and come clean. . . .  You come clean and you lay it out on the table, and you cooperate?  What we do is, is let the prosecutor know.

. . . .

Miller:  Alright, alright.  I'll tell you.  I'll be honest with you.  I ain't really wanting to do this.  I ain't really wanting to do it.  Tell you the truth, I was sitting on the porch . . . and he came by me.  He came at me and told me, he told me about the situation.

Agent Johnson:  Who's he?

Miller:  Gabriel!  The one, the one, the one it's the, it's the main boy!  The main one.  He's the main one.

Agent Johnson:  Okay.

Miller:  I ain't want to do none of this man.  All I wanted to do was go to Fairfax cause I ain't want to stay in Allendale.

Agent Johnson:  Okay.

Miller:  I knocked on the door and I opened it and . . . after that and tied him down. . . .

. . . .

Agent Johnson: Alright, so you say Gabriel tie[d] him down?

Miller: I say . . .

Agent Johnson: No, no that's the wrong, that's the wrong answer, wrong.

Miller: No . . .

Agent Johnson: Rob, look at me [boy], look at me, look at me Rob . . . s*** happens. . . . You said you didn't wanna be there and from what we was told it wasn't supposed to go down like that. Y'all was just doing a lick.[4] S*** happens. Now, the thing to do is let's see how we can minimize it. I told you . . .

Miller: I don 't . . .

Agent Johnson: I told you up front . . .

Miller: I don't . . . but listen . . .

Agent Johnson: (talking over each other) going to jail. . . .

Miller: I don't really care . . . minimize or not. I'm still getting locked up. Ain't nothing changed about that.

Agent Johnson: Yes, it is.

Miller: No, I'm still getting locked up[,] ain't nothing going to change about that. What's changed about it, tell me one thing that's changed about it?

Agent Johnson: The length of time that you going to be looking at.

---

[4] To "hit a lick" or "do a lick" means to get a lot of money quickly, usually by illegal means such as robbing someone.

Miller:  It still don't mean nothing, I'm still going to be doing the time.  I'm still doing the time man it's . . . just please stop, just please stop with me.  Please, just please.

Agent Johnson:  Well [boy], like I told you from the beginning . . .

Miller:  I said . . . I been honest with you.

Agent Johnson:  Listen, it's like I told you from the beginning, it's up to you to talk to us.  You don't have to talk to us.  If you wanna stop at any time we can stop.  It's up to you.  What do you wanna do?

Miller:  I just wanna go home man.

Agent Johnson:  Huh?

Miller:  I just wanna go home man.

Agent Johnson:  Well you ain't going home, but what you wanna do?

Miller:  I'm being honest with y'all.  I told you.

Agent Johnson:  I understand that man.

Miller:  I told you what I do . . .

Agent Johnson:  No, the only thing you told us was that you didn't want to be there and Gabriel planned . . . Gabriel did this, Gabriel did that . . . and . . . but you didn't tell us details.

Miller:  I was just . . . told you. . . .  I knocked on the door, I went in and I hit him.  And I hold him down. . . . Well he, he (inaudible) wanted to go searching the house. I know he (inaudible) . . . .  He was the main thing

searching.  (inaudible) I was just posted up the whole time.

Agent Johnson:  Yep. That's right. . . .  That's right.  You stayed in the living room with him, with, with the old man.

Miller:  Watching him.

Agent Johnson:  Watching him, that's right.

Miller:  They kept coming back.

Agent Johnson:  Who put the bag over his head?

Miller:  I did.

Agent Johnson:  Thank you.  You did.  Alright, who took the wallet out of his, umm, pocket?

Miller:  I did.

Agent Johnson:  And you know your prints and stuff will be on that wallet.[5]

. . . .

Agent Johnson:  Alright, so . . . .  All we, all we need is a clear picture from you, so when I talk with the Solicitor, "this is what Robert told us.  He's hurt.  I can tell he is hurt about it.  Whatever you can do to help him, you help him."  But like I told you from the beginning, ain't nothing we can do about stopping jail time.

Miller:  No[,] that's what I said, just lock me up.  I, I only got two choices in my life right now, either go to jail or

---

[5] During cross-examination, Agent Merrell admitted Agent Johnson lied to Miller regarding his finger-prints and none of Miller's fingerprints were found on the Victim's wallet.

die. . . . I just wanna, I just wanna go, I just wanna leave here. I'm done talking. Whenever y'all ready to lock me up, I'm ready. Let's go, please. I'm ready.

Agent Johnson: Okay, alright. You, you through talking with us?

Miller: I already told you. I told y'all the details of what happened. I admitted I did it.

Agent Johnson: I just wanted to make sure, I (inaudible) . . . you ain't wanna talk no more.

Miller: I ain't wanna talk no more. I say what I have to say, I [am] just ready to go man.

The family court waived jurisdiction to try Miller as a minor pursuant to *Kent v. United States*,[6] finding Miller could not be rehabilitated in the state's juvenile justice system. An Allendale County grand jury indicted Miller for murder, and the case proceeded to trial. The trial court held a pretrial *Jackson v. Denno*[7] hearing to determine the admissibility of Miller's confession based upon its voluntariness. During the hearing, Chief Williams and Agents Johnson and Merrell testified for the State. Kimberly Jordan, a Fourteenth Circuit juvenile public defender, testified regarding Miller's pre-waiver evaluation[8] and his ability to understand his *Miranda* rights. According to Jordan, Miller did not understand the right to remain silent or how an attorney would be helpful to him.

After reviewing the interrogation transcript, the trial court determined based upon the totality of the circumstances that Miller's statements were voluntary and his confession was admissible at trial. The trial court relied upon the following facts in making its decision: (1) Miller received *Miranda* warnings before the interrogations, and the length and location of the interrogations was reasonable; (2) although Miller likely had limited learning abilities, he was street smart and attempted to create an alibi; (3) Miller was in good physical condition with no record of mental health issues, and his criminal record was fairly limited; (4)

---

[6] 383 U.S. 541 (1966).
[7] 378 U.S. 368 (1964).
[8] The family court conducts a pre-waiver evaluation when determining if it will waive its jurisdiction to try a juvenile for his or her crimes.

neither Chief Williams nor the SLED agents made misrepresentations, promises of leniency, or threats of violence against Miller; and (5) Miller's isolation from a parent or friend was minor, considering Agent Johnson asked Miller if he was willing to talk to them after Sabb left the room and he responded "yes."

The jury unanimously found Miller guilty of murder, and the trial court held an individualized sentencing hearing as required by *Byars*.  During the sentencing hearing, Miller argued that *Miller v. Alabama*,[9] established a presumption that all juveniles are not irreparably corrupt.  Miller contended the State must prove he was irreparably corrupt, and the court must find him irreparably corrupt before moving into the *Byars* factors.  The trial court ruled *Byars* does not require a finding of irreparable corruption before sentencing a juvenile to life without the possibility of parole (LWOP) and then proceeded to consider the *Byars* factors.  The court considered Miller's age at the time of the murder and the peer pressure from his brother and Gabriel.  The court also considered Miller's poor home environment and minimal parental guidance in his life.  The court also gave weight to the brutality of the crime, particularly Victim's dentures being scattered about the room, the plastic bag placed over Victim's head, and the evidence showing Miller watched Victim's breath move the plastic bag as he left the house.  In listing these particular facts, the trial court noted even someone of Miller's relatively low mental capacity should appreciate the severity of his actions.[10]  The court concluded its analysis by allowing Miller to address his possibility for rehabilitation.  Based on its findings, the trial court sentenced Miller to fifty-five years' imprisonment.  This appeal followed.

**ISSUES ON APPEAL**

I.   Is Miller's fifty-five-year prison sentence a de facto life sentence, and if so, must a trial court find Miller irreparably corrupt before imposing such a sentence?

II.  Did the trial court err in finding Miller voluntarily waived his *Miranda* rights and in admitting Miller's confessions?

---

[9] 567 U.S. 460 (2012).

[10] At the time of the hearing, Miller was eighteen years old, and the last time his I.Q. was tested, he was in the fifth grade, and he scored in the seventy-sixth percentile.  On most I.Q. tests, scoring in the ninetieth percentile is "average."  The seventy-sixth is classified as "very low" or "well below average."

**STANDARD OF REVIEW**

"In criminal cases, the appellate court sits to review errors of law only." *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006); *see also State v. Finley*, 427 S.C. 419, 423, 831 S.E.2d 158, 160 (Ct. App. 2019) ("When considering whether a sentence violates the Eighth Amendment's prohibition on cruel and unusual punishments, the appellate court's standard of review extends only to the correction of errors of law."). Thus, the trial court's factual findings are binding on the appellate court unless clearly erroneous or controlled by an error of law. *See State v. Winkler*, 388 S.C. 574, 582–83, 698 S.E.2d 596, 601 (2010). On appeal, "the reviewing court does not re-evaluate the facts based on its own view of the preponderance of the evidence but simply determines whether the trial [court's] ruling is supported by any evidence." *State v. Parker*, 391 S.C. 606, 611–12, 707 S.E.2d 799, 801 (2011) (quoting *State v. Wilson*, 345 S.C. 1, 6, 545 S.E.2d 827, 829 (2001)). This court will not disturb the trial court's admissibility determinations absent a prejudicial abuse of discretion. *State v. Adkins*, 353 S.C. 312, 326, 577 S.E.2d 460, 468 (Ct. App. 2003). "An abuse of discretion arises from an error of law or a factual conclusion that is without evidentiary support." *Id.*

**LAW/ANALYSIS**

**I.      De Facto Life Sentence**

Miller argues his sentence of fifty-five years' imprisonment is a de facto life sentence and that a trial court must first find he was irreparably corrupt before sentencing him to life in prison. We disagree.

The Eighth Amendment to the United States Constitution states "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The prohibition against cruel and unusual punishment safeguards an individual's rights against excessive and disproportionate criminal sanctions, "highlighting the essential principle that courts must consider 'the human attributes even of those who have committed serious crimes.'" *Finley*, 427 S.C. at 424, 831 S.C. at 161 (quoting *Graham v. Florida*, 560 U.S. 48, 59 (2010)). "In this vein, sentences that are grossly out of proportion to the severity of the crime are unconstitutional." *Id.*

In *Roper v. Simmons*, the Supreme Court categorically banned all death sentences for juvenile offenders who were under the age of eighteen at the time they

committed their offense.  543 U.S. 551, 568 (2005).  In *Graham*, the Supreme Court held the Eighth Amendment banned the "imposition of a life without parole sentence on a juvenile offender who did not commit homicide."  560 U.S. at 82.  The Court noted, however, that states are "not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime.  What [states] must do . . . is give [juveniles] some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."  *Id.* at 75.  Finally, in *Miller*, the Supreme Court held "that mandatory life without parole for those under the age of [eighteen] at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'"  567 U.S. at 465.  The Court explained its rationale by relying on *Graham* and *Roper*, stating "[those decisions] make clear that a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty" on a juvenile.  *Id.* at 489.  The Court reasoned that an individualized sentencing hearing, in which it considered the defendant's age, maturity, family life, circumstances surrounding the homicide offense, the offender's ability to aid in his defense, and the possibility of rehabilitation was required to sentence a juvenile to life in prison without the possibility of parole.  *Id.* at 477–78.

Our supreme court interpreted *Miller* as creating a categorical ban on juvenile LWOP sentences "absent individualized considerations of youth" and establishing a duty for courts to "fully explore the impact of the defendant's juvenility on the sentence rendered."  *Byars* at 540–41, 543, 765 S.E.2d at 575, 577.  Therefore, pursuant to *Byars*, trial courts must hold individualized sentencing hearings and consider the mitigating factors of youth discussed in *Miller* before imposing an LWOP sentence on a juvenile.  *See id.* at 544, 765 S.E.2d at 577.

In *State v. Slocumb*, our supreme court held "[n]either *Graham* nor the Eighth Amendment, as interpreted by the [United States] Supreme Court currently prohibits the imposition of aggregate sentences for multiple offenses amounting to a [de facto] life sentence on a juvenile nonhomicide offender."  426 S.C. 297, 314–15, 827 S.E.2d 148, 157.  The court reasoned it was not appropriate, "as an inferior court, to extend federal constitutional protections under the Eighth Amendment beyond the boundaries the Supreme Court set in *Graham*."  *Id.* at 306–07, 827 S.E.2d at 153.

Based on the aforementioned precedent, we find the trial court's term-of-years sentence does not violate the Eighth Amendment.  As the court noted in *Slocumb*, we are bound by the constitutional protections implemented by the Supreme Court,

which has thus far declined to extend the holding of *Graham* and its progeny to term-of-year sentences.

As to Miller's argument that a trial court must specifically find a juvenile is "irreparably corrupt" before sentencing him or her to a life sentence, pursuant to *Jones v. Mississippi*, such a finding is not required under the Eighth Amendment. *See* 141 S. Ct. 1307, 1318–19 (2021) ("[T]he Court has unequivocally stated that a separate factual finding of [irreparable corruption] is not required before a [trial court] imposes a life-without-parole sentence on a murderer under 18."). Further, in a case involving a juvenile who commits homicide, "a [s]tate's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." *Id.* at 1313. In South Carolina, *Byars* mandates only that trial courts hold an individualized sentencing hearing in which all the "mitigating hallmark features of youth are fully explored." 410 S.C. at 545, 765 S.E.2d at 578; *see also Miller*, 567 U.S. at 480 ("Although we do not foreclose a [trial court's] ability to [impose a sentence of life without parole] in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.").

We find the trial court did not err in its sentencing procedure. The record shows the trial court held an individualized sentencing hearing in which both the State and Miller were able to present arguments regarding Miller's juvenility. The trial court stated if Miller was an adult, it would impose a de jure sentence of life in prison; however, the trial court considered each factor listed in *Byars* and then sentenced Miller to a term-of-years prison sentence under South Carolina's discretionary sentencing scheme. Because neither the Eighth Amendment nor *Byars* requires the trial court to find Miller "irreparably corrupt" and the court considered the "mitigating hallmark features" of Miller's youth in an individualized sentencing hearing, we find it did not err in sentencing Miller. Accordingly, we affirm the trial court on this issue.

## II.    Admission of Incriminating Statements

Miller argues the trial court erred in admitting confessions he made during custodial interrogation. Specifically, Miller argues that due to his age, his low intellectual functioning, and the coercive pressure applied during the interrogation, his confessions were not given pursuant to a voluntary, knowing, and intelligent waiver of his *Miranda* rights. We disagree.

In *Jackson v. Denno*, the United States Supreme Court held, "It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession." 378 U.S. at 376. "A statement obtained as a result of custodial interrogation is inadmissible unless the suspect was advised of and voluntarily waived his [constitutional] rights." *State v. Miller*, 375 S.C. 370, 379, 652 S.E.2d 444, 449 (Ct. App. 2007). "If [an] interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475. Whether an individual voluntarily waived his *Miranda* rights requires a two-step inquiry:

> (1) the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and (2) the waiver must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

*State v. Moses*, 390 S.C. 502, 513, 702 S.E. 395, 401 (Ct. App. 2010) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 382–83 (2010)).

"In South Carolina, the test for determining whether a defendant's confession was given freely, knowingly, and voluntarily focuses upon whether the defendant's will was overborne by the totality of the circumstances surrounding the confession." *Id.*

> [T]he totality of the circumstances includes "the youth of the accused, his lack of education or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep."

*State v. Pittman*, 373 S.C. 527, 566, 647 S.E.2d 144, 164 (2007) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (citations omitted)). Regarding juveniles, our courts have also weighed (1) the juvenile's background, experience, conduct, maturity, physical condition, mental health, and isolation

from a parent and (2) any misrepresentations, threats of violence, exertion of improper influence, or promises made by law enforcement. *Moses*, 390 S.C. at 513–14, 702 S.E.2d at 401. "No one factor is determinative; each case requires careful scrutiny of all the surrounding circumstances." *In re Tracy B.*, 391 S.C. 51, 66, 704 S.E.2d 71, 79 (Ct. App. 2010).

We find the trial court did not err in finding Miller voluntarily waived his *Miranda* rights based on the totality of the circumstances. First, although Miller was fifteen years old when he murdered Victim and when he confessed, youth alone is insufficient to prove the involuntariness of a defendant's confession. *See Pittman*, 373 S.C. at 569, 647 S.E.2d at 166 (stating that when only evidence of a defendant's youth is presented, that alone is not probative of coercion); *accord Williams v. Peyton*, 404 F.2d 528, 530 (4th Cir. 1968) ("Youth by itself is not a ground for holding a confession inadmissible."). Further, our precedent clearly establishes that a juvenile is capable of voluntarily waiving his *Miranda* rights before incriminating himself. *See e.g.*, *Pittman*, 373 S.C. at 569–70, 647 S.E.2d at 166 (holding a twelve-year-old who was questioned alone by two officers voluntarily waived his rights before confessing to a double homicide); *State v. Boys*, 302 S.C. 545, 548, 397 S.E.2d 529, 531 (1990) (finding a seventeen-year-old voluntarily waived his rights after his mother told him he needed an attorney and to not speak to officers); *Moses*, 390 S.C. at 514–15, 702 S.E.2d at 401–02 (finding a seventeen-year-old special education student who could read and write on a third grade level voluntarily waived his rights); *In re Christopher W.*, 285 S.C. 329, 329–31, 329 S.E.2d 769, 769–70 (Ct. App. 1985) (holding an eleven-year-old voluntarily waived his rights even after the trial court expressed extreme displeasure with the coercive nature of his interrogation because the juvenile was "intelligent, quick, and articulate").

Second, although Miller had a low I.Q., the record indicates that he was streetwise and knew how to conduct himself in front of police officers. *See In re Williams*, 265 S.C. 295, 301, 217 S.E.2d 719, 722 (1975) ("Mental deficiency alone is not sufficient to render a confession involuntary but . . . it is a factor to be considered along with all of the other attendant facts and circumstances in determining the voluntariness of the confession."). The trial court relied on the fact that Miller gave an alibi several times when talking to Agent Merrell, and he knew several officers that he came into contact with during the investigation. The record also showed Miller was only one year behind in school. Chief Williams testified he Mirandized Miller before interrogating him, and Miller read him each right individually from a standard waiver form. Chief Williams stated he asked Miller if he understood his rights, and Miller responded affirmatively and initialed beside

each right.  Miller also signed the written waiver form.  *See State v. Smith*, 268 S.C. 349, 352–54, 234 S.E.2d 19, 20–21 (1977) ("The decisions are voluminous that the signing of a written waiver is usually sufficient [to constitute a voluntary waiver].");  *see also Moses*, 390 S.C. at 514–15, 702 S.E.2d at 401–02 (holding a juvenile who could read and write on a third grade level voluntarily and knowingly waived his rights because the officer read the juvenile's rights verbatim from a waiver of rights form and asked if he understood the rights).

Third, although Miller was questioned twice by three different officers and was not re-Mirandized before his second interrogation, the length of both interrogations was not prolonged, and the amount of time between the first and second interrogation was minimal.  *In re Tracy B.*, 391 S.C. at 67–68, 704 S.E.2d at 79 (finding that even though a juvenile did not receive fresh *Miranda* rights before interrogation recommenced, he voluntarily waived those rights because the interrogating officer asked him if he had already received *Miranda* warnings, the juvenile responded that he had, and less than two hours had passed since the juvenile was initially Mirandized).  The record shows that Miller arrived at the police station at approximately 4:00 P.M., and Agents Johnson and Merrell concluded their interrogation around 7:00 P.M.  Miller received *Miranda* warnings before his initial interrogation by Chief Williams, and even though Agents Johnson and Merrell did not re-Mirandize Miller before interrogating him, Agent Johnson repeatedly advised him that it was his choice to speak with them and that he could end the interrogation at any time.

Fourth, the interrogation tactics Agents Johnson and Merrell used against Miller were not forceful enough to overbear Miller's will in light of the surrounding circumstances.  *See State v. Register*, 323 S.C. 471, 479, 476 S.E.2d 153, 158 (1996) ("[A] defendant's will is not overborne merely because he is led to believe that the government's knowledge of his guilt is greater than it actually is.");  *id.* at 478, 476 S.E.2d at 158 (holding that a defendant's waiver of rights was voluntary even though officers isolated him and deceived him by telling him someone saw him with the victim the night of the murder, his shoes and car tires matched impressions found at the murder scene, and that the officers had irrefutable DNA evidence establishing his guilt).  Agent Johnson's statements that Miller's fingerprints would be on Victim's wallet and that the State had enough evidence against Miller to prosecute him, when combined with all the other facts, were insufficient to overbear Miller's will.  Agent Johnson's interrogation of Miller after Miller expressed an apprehension about talking to him nor his statements about minimizing Miller's prison sentence were sufficient to overbear Miller's will.  The agents did not coerce Miller or threaten him with adverse consequences or physical

punishment if he did not cooperate during his interrogation, and they did not make him any specific promises of leniency. *See Pittman*, 373 S.C. at 568, 647 S.E.2d at 165 ("Although courts have given confessions by juveniles special scrutiny, courts generally do not find a juvenile's confession involuntary whe[n] there is no evidence of extended, intimidating questioning or some other form of coercion.").

Finally, we find the officers interrogating Miller without a parent present was not sufficient to render his waiver of rights involuntary. *See In re Christopher W.*, 285 S.C. at 330, 329 S.E.2d at 770 ("The South Carolina Supreme Court has rejected the position a minor's inculpatory statement obtained in the absence of counsel, *parent*, or other friendly adult is [per se] inadmissible." (emphasis added)); *see also Moses*, 390 S.C. at 515, 702 S.E.2d at 402 (finding a juvenile's mother's request to be present during her child's interrogation was not dispositive of the juvenile's waiver). Miller stated during his interrogation that he was comfortable talking to agent Merrell without both his mother and Sabb present.

Based on the foregoing, we find the trial court did not abuse its discretion in finding Miller voluntarily waived his rights. *See Adkins*, 353 S.C. at 326, 577 S.E.2d at 468 (stating that appellate courts do not disturb a trial court's admissibility determinations absent a finding of prejudicial abuse of discretion).

## CONCLUSION

Accordingly, Miller's sentence and conviction is

**AFFIRMED.**

**HUFF and GEATHERS, JJ., concur.**