# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Robert Lee Miller, III, Petitioner.

Appellate Case No. 2021-000985

―――――――――

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

―――――――――

Appeal from Allendale County
R. Lawton McIntosh, Circuit Court Judge

―――――――――

Opinion No. 28178
Heard May 16, 2023 – Filed September 13, 2023

―――――――――

## AFFIRMED

―――――――――

Appellate Defender Lara M. Caudy, of Columbia, for Petitioner.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General W. Jeffrey Young, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, and Senior Assistant Attorney General Mark Reynolds Farthing, all of Columbia; and Solicitor Isaac McDuffie Stone III, of Bluffton, all for Respondent.

Hannah Lyon Freedman, of Justice 360, of Columbia, and John H. Blume, III, of Ithaca, New York, of Cornell Juvenile Justice Project, Amici Curiae.

_____

**ACTING CHIEF JUSTICE KITTREDGE:** Petitioner Robert Miller III was convicted of the brutal murder of eighty-six-year-old Willie Johnson (the victim). Following the murder, Petitioner—who was fifteen years old at the time—confessed four times: twice to his close friends and twice to law enforcement. All four confessions were admitted at trial, three without objection. This appeal centers around the voluntariness of Petitioner's fourth and final confession to two agents of the South Carolina Law Enforcement Division (SLED). After examining the totality of the circumstances surrounding the fourth confession, we hold that Petitioner's free will was not overborne, and his confession was voluntary. We therefore affirm.

## I.

The elderly victim lived alone in Allendale, South Carolina. On the night of the murder, three juveniles—Petitioner, his older brother (Kashawn Bynum), and his brother's friend (Gabriel Joyner)—knocked on the victim's door before overpowering the victim and forcing their way into the house. While inside, the juveniles bound the victim's hands before nearly beating the victim to death, resulting in the victim's dentures being shattered and scattered around the room. Petitioner then tied a plastic trash bag over the victim's head and left him while he was still breathing. The victim asphyxiated and was found two days later by members of his church who were concerned that they had not heard from the elderly victim. During the subsequent investigation, law enforcement found a single bloody handprint on the wall at the crime scene, which they later determined was made out of the victim's blood and definitively matched Petitioner's handprint.

One week after the murder, in an unrelated crime, a fourteen-year-old boy was shot in Fairfax, South Carolina (approximately five miles from Allendale). Petitioner and his best friend, Jonathan Capers, immediately became suspects and were brought in for questioning at around 3:00 or 4:00 p.m. by the Fairfax Police Department. Petitioner and Capers were accompanied by Capers's mother, Tiffany Sabb, who—in Petitioner's words—was "like a mother" to him.

Slightly before 5:00 p.m., Chief Marvin Williams interviewed Petitioner alone in his office. After Chief Williams mirandized[1] Petitioner, he began questioning Petitioner in regards to the shooting in Fairfax. According to Chief Williams, Petitioner—unprompted—instead confessed his involvement with the victim's murder in Allendale:

> [Petitioner] said that he didn't do the shooting in Fairfax. He thought we wanted him for the incident that took place in Allendale. And I stated, what are you talking about. And he went into the situation of . . . the beating of the old man in Allendale. . . . [Petitioner] stated that they pushed [the victim] down . . . , robbed him[,] beat him . . . and put a bag over his head. And I asked him, why [did] you put a bag over his head. He said [the victim] kept looking at him. That is why he put the bag over his head.

Knowing he had no jurisdiction over the Allendale murder, Chief Williams left the room and contacted two SLED agents in the area—Agents Richard Johnson and Natasha Merrell—who were already investigating the matter. Over the next thirty minutes, Petitioner remained alone in the interview room while law enforcement talked to Capers; Capers gave a statement indicating Petitioner had confessed (to Capers) his role in the victim's murder.

According to Capers, Petitioner told him that Bynum and Joyner had planned to "hit a lick" and pulled Petitioner into their scheme. Petitioner told Capers they knocked on the door of Joyner's across-the-street neighbor and asked the victim for some sugar, but the victim said he did not trust them because he had been "getting robbed lately and before." The three juveniles then rushed the victim "and hit him and then he fought." Bynum and Joyner ransacked the house while Petitioner tied up and beat "the old man." After stomping on the victim's face, Petitioner then put a plastic bag on the victim's head, and the three juveniles left.

After obtaining Capers's statement, SLED Agents Johnson and Merrell interviewed Petitioner for approximately one hour.[2] At the outset of the interview, Petitioner

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] The interview was recorded (audio only) on Agent Merrell's SLED iPhone. Despite the interview lasting for an hour, the recording of the interview submitted at trial was only around thirty minutes long. Apparently, the interview was heavily redacted for all mentions of the Fairfax shooting and any mention of Petitioner's extensive use of marijuana. Additionally, the portion of the interview introduced at trial stops

was in the room with Sabb, Agent Johnson, Agent Merrell, and Chief Williams. The three law enforcement officers did not re-mirandize Petitioner because Chief Williams advised the SLED agents that he had already done so during the initial interview thirty minutes earlier. Agent Johnson asked the questions at first, confirming Petitioner was "okay with talking to us" and "okay with [his mom not being present]." At Agent Johnson's inquiry, Petitioner confirmed he was in summer school after failing eighth grade but that he could read and write.

Chief Williams left the room, and Agent Johnson asked Sabb if she would mind if they talked to Petitioner without her present as well. Sabb agreed, but before she could leave the room, Petitioner interjected that he would like to speak to Agent Merrell alone. Agent Johnson stated, "Okay, that's fine, you don't like males? I intimidate you?," to which Petitioner replied, "I just got more respect for females."

After Sabb left the room, but before Agent Johnson left, he asked Petitioner if he needed to use the restroom and if he was "good with just what we have done" so far in the interview (i.e., sending Sabb out). Likewise, Agent Johnson reiterated to Petitioner, "[I]t's up to you if you wanna talk to us now. You said you okay. Isn't that right?" Petitioner responded, "Yes, sir," and Agent Johnson left the room.

Agent Merrell then questioned Petitioner about his involvement in the murder, but Petitioner maintained he had an alibi. Specifically, Petitioner denied being in Allendale the Tuesday of the murder, claiming he had been in Fairfax for summer school until that Friday (three days later). Petitioner told Agent Merrell she could confirm his alibi with "Gail," a school bus driver who lived in a trailer "down the road." Agent Merrell pressed him, asking whether he was sure he had not been in Allendale on Tuesday night. Petitioner admitted that on Tuesday morning, he attended a hearing at an alternative school in Allendale. Agent Merrell asked how

---

and starts at certain parts, some of which are due to the redactions, others of which are due to Agent Merrell's iPhone receiving an incoming call, which (unbeknownst to the SLED agents) automatically stopped the recording. In this appeal, we were provided with, and thus only analyze, the portion of the interview introduced at trial. We offer no comment on whether the redacted portions of the interview made it more or less coercive than what is evident from the version submitted to the jury. Likewise, while not raised by either party, we note there are discrepancies between the transcript of the interview and the actual audio recording of the interview. We have relied on the audio recording rather than the transcript.

he got back to Fairfax after the hearing, but Petitioner "c[ould]n't really say," other than he was sure he attended summer school Wednesday morning in Fairfax.

Petitioner then informed Agent Merrell that he had recently spoken to two Allendale police detectives—one of whom Petitioner knew from his past interactions with law enforcement—that were looking for Joyner. However, Petitioner insisted he did not "know . . . anything about [Joyner]" and had never associated with him.

At that point, Agent Merrell asked Agent Johnson to re-enter the interview room and take back over. Petitioner did not object or express any discomfort.

Agent Johnson informed Petitioner he was going to jail that day no matter what was said in the interview. Explaining he "want[ed] to try and help [Petitioner] on the far end," Agent Johnson asserted that all of the perpetrators would get the same amount of jail time except for the one who cooperated.

Next, Agent Johnson attempted to tell Petitioner that law enforcement had already discovered his fingerprints and DNA at the crime scene, but before he could do more than ask Petitioner the setup question of "Do you watch CSI?," Petitioner interrupted, changing the subject and asking how many years his sentence would be for the victim's murder.[3] Agent Johnson then said,

> You ain't getting out of this, but what you can do is minimize the kind of time. Look at it this way, alright, I don't know what kind of time you'll get. I can't tell you that. I'm not the judge or the lawyer. But here's what I'm getting at, I'm just throwing some hypothetical numbers out. Let's say if you were looking at 30 years and because you talked, let's say you tell the truth and come clean . . . and you lay it out on the table, and you cooperate? What we do is, is let the prosecutor know. . . . That's the one who is going to try and send you to prison.

Petitioner immediately confessed, stating he was at home when Joyner arrived with a plan to rob the victim (Joyner's neighbor), and that while he (Petitioner) did not want to participate, he went along with Joyner and Bynum. Petitioner related that,

---

[3] In particular, Agent Johnson stated, "There's this thing that you don't know. That while you were here, we already got what we need. You ever watch CSI?" Petitioner's response was, "How many years I got?"

after knocking on the victim's door, he opened it and hit the victim, then Joyner bound the victim.

Agent Johnson asked what happened next, but rather than continue the narrative, Petitioner stated he "was tired of doing this" because it was "all fucked up." Agent Johnson feigned understanding and told Petitioner his goal should be to minimize the "length of time that [he was] looking at doing." Petitioner disagreed, stating that it "still don't mean nothing [because he would] still be doing the time." Petitioner therefore told Agent Johnson to just take him straight to jail.

Agent Johnson stated, "Listen, it's like I told you from the beginning, it's up to you to talk to us. You don't have to talk to us. If you wanna stop at any time we can stop. It's up to you. What do you wanna do?" Petitioner stated he wanted to go home, but Agent Johnson told him that was impossible at that stage and asked Petitioner again whether he wanted to continue the interview. Petitioner stated he had already told the agents about his involvement, but Agent Johnson disagreed, stating Petitioner had blamed Joyner for everything and did not give sufficient detail about his own involvement.

Petitioner responded, "I was just told you. I knock on the door, I went in, and I hit him. And I hold him down." He continued, stating law enforcement would find Joyner's fingerprints all over the victim's house because Joyner was the one rifling through the victim's belongings, and he (Petitioner) did not know what was inside the house; rather, Petitioner "was just posted up out in the living room the whole . . . time." Agent Johnson asked, "Who put the bag over his head?" to which Petitioner responded simply, "I did." Agent Johnson followed up, inquiring who took the victim's wallet out of his pocket, to which Petitioner responded, "I did." Agent Johnson said, "And you know your prints and stuff will be on that wallet [when it is tested in the coming months]. Thank you. That's why I asked you if you have ever seen CSI." Petitioner then indicated he was done answering questions, and the interview immediately ended.

Petitioner, Joyner, and Bynum were all arrested that night and charged with the victim's murder. Due to the severity and violent nature of the crime, Petitioner was waived from family court to the Court of General Sessions for trial.

Before Petitioner's trial, Sabb gave a statement to law enforcement in which she explained that, on the night of the murder, Petitioner had confessed his involvement in the slaying to her. Specifically, Sabb asserted she was the one who drove him back from Allendale to Fairfax on the night of the murder. Sabb claimed she had

heard from a friend that night that Petitioner was involved in the victim's death, so she questioned him about it. As Sabb recounted,

> It was not [Petitioner's] idea, he was pulled into it. . . . According to what [Petitioner] said, that it was the other two when they knocked on the door, they asked the old man for some sugar. The . . . older man told them that he . . . was not going to . . . give them any sugar, because . . . [s]omebody . . . already was trying to rob him. . . . So, apparently, the other two young gentlemen[] must have kicked in the door. And [Petitioner] said it was too late. The old man had done seen all three of them. S[o] all three of them went in the house together. . . . I guess they tortured the old man. . . . They beat him. . . . The only part that [Petitioner] mentioned to me about the [plastic] bag [over the victim's head] was, when I asked him, how did you know that the old man was still alive. He said that he was still breathing because the bag was moving [as Petitioner, Bynum, and Joyner were leaving].

During the pretrial *Jackson v. Denno*[4] hearing, Petitioner sought to suppress his confessions to both Chief Williams and the SLED agents; however, Petitioner did not seek to suppress his confessions to Capers and Sabb. Chief Williams, Agent Johnson, and Agent Merrell testified at the hearing. In addition to recounting the facts surrounding the interviews, all of which are summarized above, the three related that Petitioner was relaxed enough during certain redacted portions of the interview with Agents Johnson and Merrell to laugh with them about his marijuana usage.

In response, Petitioner called his attorney from the waiver proceedings, Kimberly Jordan (a juvenile public defender). Jordan testified about her observance of a pre-waiver evaluation of Petitioner conducted by a psychologist with the Department of Juvenile Justice (DJJ). According to Jordan, the evaluation revealed that, while it was not definitive, there was a possibility Petitioner did not understand the *Miranda* warning read during the evaluation.[5]

---

[4] 378 U.S. 368 (1964).

[5] Of note, Jordan did not testify about any of the other evidence elicited or argued at the waiver hearing, including Petitioner's IQ (76) or his reading comprehension level (fourth grade). As a result, that information was not before the trial court.

The trial court waited until the next day to issue its ruling, ultimately finding both statements to law enforcement were voluntary and admissible based on the totality of the circumstances. In support of its ruling, the court analyzed Petitioner's personal characteristics, the structure of the interviews, and law enforcement's actions during the interviews.

Regarding Petitioner's personal characteristics, the trial court acknowledged that Petitioner's age and maturity level were concerning and that Petitioner was "somewhat limited on an educational basis," as evidenced by his "vernacular" used during the interviews. However, the court also noted Petitioner had several prior encounters with law enforcement that gave him experience with being interviewed as a suspect.[6] Moreover, the trial court found Petitioner to be "pretty street smart" because Petitioner immediately and repeatedly claimed that he had an alibi for the night of the murder. Likewise, the court explained Petitioner appeared to be in "good physical condition" throughout the interview and his responses to the officers' questions were appropriate and indicated his understanding was adequate.

Turning next to the structure of the interviews, the trial court placed emphasis on the fact that Petitioner was advised of his *Miranda* rights before the interviews began. Further, the trial court found the length and location of the interviews were "fine" and "entirely reasonable in the circumstance."

Finally, examining law enforcement's actions during the interviews, the trial court held the law enforcement officers did not unduly coerce Petitioner into confessing, even when viewing the interaction from Petitioner's standpoint. The court specifically explained law enforcement did not make any misrepresentations, promises of leniency, or threats of violence in securing Petitioner's confessions. Likewise, the trial court emphasized Agent Johnson expressly clarified he could not promise Petitioner a reduced sentence, but instead could only inform the State of Petitioner's cooperation. Finally, the court noted that Sabb, as a stand-in for Petitioner's biological mother, was present at the beginning of the interview, and Agent Johnson confirmed Petitioner was still willing to talk to law enforcement both before and after Sabb left the interview room. The court concluded that while certain

---

[6] The trial court specifically referred to the fact that Petitioner knew some of the Allendale police detectives by name before his interview with the SLED agents. Likewise, the trial court considered Petitioner's juvenile record, which included several adjudications of delinquency in family court for second-degree burglary, third-degree assault and battery, petit larceny, and disturbing schools. Petitioner was on probation for the burglary offense when he murdered the victim.

statements in isolation could be given "what meaning that you want to prescribe them," the totality of the circumstances indicated Petitioner was not unduly coerced.

At trial, Capers and Sabb both testified without objection, relating the details of Petitioner's confessions to them. While Petitioner renewed his motion to suppress the confession to the SLED agents, he did not similarly renew the motion as it related to his confession to Chief Williams. As a result, Chief Williams also testified without objection regarding the details of Petitioner's confession to him.[7] Over Petitioner's objections, Agents Johnson and Merrell testified regarding the fourth and final confession. The jury took slightly more than hour to find Petitioner guilty of the victim's murder. Following an *Aiken*[8] hearing, the trial court sentenced Petitioner to fifty-five years' imprisonment.

Petitioner appealed, and the court of appeals affirmed. *State v. Miller*, 433 S.C. 613, 861 S.E.2d 373 (Ct. App. 2021). In relevant part, the court of appeals examined the facts surrounding the fourth confession and found that "the trial court did not err in finding [Petitioner] voluntarily waived his *Miranda* rights based on the totality of the circumstances." *Id.* at 629–32, 861 S.E.2d at 381–83. We granted a writ of certiorari to review the decision of the court of appeals.

## II.

As an initial matter, we take this opportunity to revisit and clarify the appropriate standard of review for determining the voluntariness of a criminal defendant's statement. Historically, in analyzing the voluntariness of a statement, South Carolina courts have employed a bifurcated process under which both the trial court and the jury separately evaluate the voluntariness of a statement. *See, e.g., State v. Washington*, 296 S.C. 54, 56, 370 S.E.2d 611, 612 (1988); *State v. Smith*, 268 S.C. 349, 354, 234 S.E.2d 19, 21 (1977). Then, on appeal, the appellate court reviews only the trial court's determination: without reevaluating the facts based on its own

---

[7] More specifically, Petitioner objected during Chief Williams's recount of his confession, but it was only a preemptive objection to ensure Chief Williams did not mention the Fairfax shooting in discussing why he was questioning Petitioner in the first place.

[8] *Aiken v. Byars*, 410 S.C. 534, 539–44, 765 S.E.2d 572, 575–77 (2014) (requiring, for juvenile defendants eligible to receive a sentence of life without the possibility of parole, a hearing in which the parties and court explore how the juveniles' youth and life experiences affected their actions).

view of the preponderance of the evidence, an appellate court determines whether the trial court's ruling is supported by any evidence. *State v. Brewer*, 438 S.C. 37, 44, 882 S.E.2d 156, 160 (2022), *cert. denied*, 143 S. Ct. 2649 (2023); *State v. Saltz*, 346 S.C. 114, 136, 551 S.E.2d 240, 252 (2001).

Contrary to our historic bifurcation of this issue, the United States Supreme Court has explained multiple times that "the ultimate issue of 'voluntariness' is a legal question." *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) (citation omitted) (collecting cases).[9] To that end, as we recently noted, "some jurisdictions view the question of whether a statement was voluntarily given as a mixed question of law and fact." *Brewer*, 438 S.C. at 44 n.1, 882 S.E.2d at 160 n.1 (citing several cases for the proposition that the appellate court would accept the trial court's factual findings unless clearly erroneous and review the ultimate legal conclusion—the voluntariness of the statement—de novo); *see also Crane v. Kentucky*, 476 U.S. 683, 688–89 (1986) ("[T]he circumstances surrounding the taking of a confession can be highly relevant to two separate inquiries, one legal and one factual. The manner in which a statement was extracted is, of course, relevant to the purely legal question of its voluntariness, a question most, but not all, States assign to the trial judge alone to resolve. But the physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence." (internal citation omitted)).

We agree with those jurisdictions that have found the question of voluntariness presents a mixed question of law and fact. Accordingly, we take this opportunity to refine our standard of review. Going forward, we will review the trial court's factual findings regarding voluntariness for any evidentiary support. However, the ultimate legal conclusion—whether, based on those facts, a statement was voluntarily made—is a question of law subject to de novo review.[10]

---

[9] *See also Lego v. Twomey*, 404 U.S. 477, 489–90 (1972) (rejecting the petitioner's contention that, even though the trial court ruled on the voluntariness of his statement, he was entitled to have a jury decide the question anew; "the normal rule [is] that the admissibility of evidence is a question for the court rather than the jury"); *Jackson*, 378 U.S. at 382–83 (asserting a jury may "find it difficult to understand the policy forbidding reliance upon a coerced, but true, confession . . . and an issue which may be reargued in the jury room," and questioning whether a jury tasked with determining whether the State has met its burden of proof can simultaneously decide in a reliable manner whether a defendant's statement was voluntary).

[10] Based on our recognition of voluntariness as a legal question, it is unnecessary

## III.

There are two constitutional bases requiring any confessions admitted into evidence to be voluntary: the Due Process Clause of the Fourteenth Amendment and the Fifth Amendment right against self-incrimination. *Dickerson v. United States*, 530 U.S. 428, 433 (2000). Petitioner claims a violation of both of those rights with respect to his statement to Agents Johnson and Merrell. We therefore discuss each right in turn.

## A.

"[C]ertain interrogation techniques, either in isolation, or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton*, 474 U.S. 104, 109 (1985). As a result, "[i]t is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession." *Jackson*, 378 U.S. at 376; *see also Dickerson*, 530 U.S. at 433 ("[C]oerced confessions are inherently untrustworthy.").

In analyzing whether a defendant's will was overborne and the resulting confession was offensive to due process, courts must consider the totality of the circumstances, including the details of the interrogation and the characteristics of the defendant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Ultimately, the determination will depend "upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." *Dickerson*, 530 U.S. at 434 (citation omitted). Courts may consider the impact of a number of factors, such as:

---

going forward for trial courts to submit the question of voluntariness to the jury. Of course, however, the parties may continue to argue to the jury why a statement is more or less trustworthy based on its voluntary nature. *See Crane*, 476 U.S. at 688, 691 ("[B]ecause questions of credibility, whether of a witness or of a confession, are for the jury, the requirement that the court make a pretrial *voluntariness* determination does not undercut the defendant's traditional prerogative to challenge the confession's *reliability* during the course of the trial. . . . As both *Lego* and *Jackson* make clear, evidence about the manner in which a confession was obtained is often highly relevant as to its reliability and credibility." (cleaned up)).

1. the youth and maturity of the accused;

2. the accused's lack of education or low intelligence;

3. the failure to advise the accused of his constitutional rights, particularly the rights to remain silent and have counsel present;

4. the presence of a written waiver signed by the accused regarding his constitutional rights;

5. the physical condition of the accused, including whether the accused was intoxicated at the time of the interrogation;

6. the mental health of the accused;

7. the length of the interrogation;

8. the location of the interrogation;

9. the continuity of the interrogation;

10. the repeated or prolonged nature of the interrogation;

11. the use of physical punishment, including both physical brutality as well as the deprivation of food or sleep;

12. whether law enforcement offered specific promises of leniency, rather than general remarks that a cooperative attitude would be to the accused's benefit; and

13. whether law enforcement made deliberate misrepresentations of the evidence against the accused.[11]

---

[11] *See Withrow v. Williams*, 507 U.S. 680, 693–94 (1993) (collecting cases); *Colorado v. Connelly*, 479 U.S. 157, 164 (1986); *Fare v. Michael C.*, 442 U.S. 707, 727 (1979); *Schneckloth*, 412 U.S. at 226 (internal citations omitted); *Frazier v. Cupp*, 394 U.S. 731, 739 (1969); *Gallegos v. Colorado*, 370 U.S. 49, 55 (1962); *Brewer*, 438 S.C. at 45–46, 882 S.E.2d at 160–61; *State v. Register*, 323 S.C. 471, 478–79, 476 S.E.2d 153, 158 (1996); *State v. Davis*, 309 S.C. 326, 341–42, 422 S.E.2d 133, 143 (1992), *overruled on other grounds by Brightman v. State*, 336 S.C. 348, 520 S.E.2d 614 (1999); *State v. Peake*, 291 S.C. 138, 139, 352 S.E.2d 487, 488 (1987); *Smith*, 268 S.C. at 354, 234 S.E.2d at 21; *State v. Callahan*, 263 S.C. 35, 41,

Likewise, when the accused is a juvenile, courts may also consider other "special concerns," including:

1.      the presence and competence of parents;

2.      the minor's prior experience with law enforcement;

3.      the minor's background;

4.      whether the minor has the capacity to understand the nature of his *Miranda* warnings and the consequences of waiving those rights; and

5.      the minor's development of an alibi to conceal his involvement in the crime.[12]

None of these factors are dispositive in and of themselves; rather, they must be considered in their totality to determine whether the defendant's will was overborne. *State v. Moses*, 390 S.C. 502, 514, 702 S.E.2d 395, 401 (Ct. App. 2010) (first citing *Schneckloth*, 412 U.S. at 226–27; and then citing *Pittman*, 373 S.C. at 566, 647 S.E.2d at 164); *cf., e.g.*, *Smith*, 268 S.C. at 354–55, 234 S.E.2d at 21 (noting the Court had declined to adopt a rule that any inculpatory statement obtained from a minor in the absence of his parents was inadmissible per se, and instead applying a totality of the circumstances analysis). Moreover, "Although courts have given confessions by juveniles special scrutiny, courts generally do not find a juvenile's confession involuntary where there is no evidence of extended, intimidating questioning or some other form of coercion." *Pittman*, 373 S.C. at 568, 647 S.E.2d at 165; *id.* at 568 n.8, 647 S.E.2d at 165 n.8 (collecting cases); *see, e.g.*, *Gallegos*, 370 U.S. at 53–55 (holding involuntary the confession of a fourteen-year-old juvenile defendant who was held in police custody with no visitation for five days); *Haley v. Ohio*, 332 U.S. 596, 597–600 (1948) (finding inadmissible the confession of a fifteen-year-old defendant who was questioned continuously by "relays of

---

208 S.E.2d 284, 286 (1974).

[12] *See Fare*, 442 U.S. at 725; *In re Gault*, 387 U.S. 1, 55 (1967), *abrogated on other grounds by Allen v. Illinois*, 478 U.S. 364 (1986); *State v. Pittman*, 373 S.C. 527, 566–67, 647 S.E.2d 144, 164–65 (2007); *Smith*, 268 S.C. at 354, 234 S.E.2d at 21; *State v. Parker*, 381 S.C. 68, 86–87, 671 S.E.2d 619, 628–29 (Ct. App. 2008) (quoting *State v. Miller*, 375 S.C. 370, 385–86, 652 S.E.2d 444, 452 (Ct. App. 2007)); *In re Christopher W.*, 285 S.C. 329, 331, 329 S.E.2d 769, 770 (Ct. App. 1985).

police" with no parent present for about five hours beginning around midnight and was not informed of his right to counsel); *Thomas v. North Carolina*, 447 F.2d 1320, 1321–22 (4th Cir. 1971) (granting a writ of habeas corpus to a fifteen-year-old defendant (with a fourth-grade education and an IQ of 72) due to an improperly admitted confession secured after the defendant was taken into custody at midnight, questioned until 4:30 a.m., given a three-hour reprieve, and then questioned again from 7:30 a.m. to 5 p.m. by a team of officers who rotated interrogations and drove the defendant to various crime scenes while inquiring about his involvement in the offenses).

Here, Petitioner contends there were a number of factors that tended to show his fourth confession to Agents Johnson and Merrell was coerced, including his youth, "limited cognitive functioning," promises of leniency by Agent Johnson, the alleged failure to adequately mirandize him, the use of sophisticated interrogation techniques, and the absence of a parent during the interview.[13]  While acknowledging that certain facts in isolation could be viewed as coercive, we disagree that the totality of the circumstances indicates Petitioner's fourth confession was involuntary.

Specifically, looking first at the details of the interrogation, Petitioner was advised of his constitutional rights—including his right to remain silent and his right to counsel—and asked if he understood them before signing a *Miranda* waiver.  By all accounts, Petitioner appeared to understand his rights and the questions he was subsequently asked.  While Petitioner was not re-mirandized before his interview with Agents Johnson and Merrell, the break between the interview with Chief Williams (in which Petitioner was mirandized) and the interview with Chief Williams and Agents Johnson and Merrell was only thirty minutes, and Petitioner did not leave the custodial interrogation setting in the interim.  Such a minimal break in the continuity of the interview did not require Petitioner to be re-mirandized, especially because there is no allegation that something occurred after Petitioner's *Miranda* waiver that would have affected his understanding of his rights.[14]

---

[13] Petitioner also informed Agent Merrell during the interview that he had been told by his classmates that SLED agents would hold him at gunpoint due to his involvement in the victim's murder, but Agent Merrell expressly refuted that notion.

[14] *See, e.g.*, *United States v. Andaverde*, 64 F.3d 1305, 1312 (9th Cir. 1995) ("[R]ewarning [a defendant of his *Miranda* rights] is not required simply because some time has elapsed. . . . [T]here is no requirement that an accused be continually reminded of his rights once he has intelligently waived them." (cleaned up)); *id.* at

During the interview, Petitioner was not handcuffed and, at that time, had not been charged with any crimes. Likewise, throughout the overwhelming majority of the questioning, Petitioner was in the room with only one law enforcement officer at a time. Moreover, Petitioner was only interviewed for approximately two hours in the late afternoon to early evening, with a break of approximately thirty minutes during which law enforcement secured a statement from Capers.[15] The questioning by Agents Johnson and Merrell was not unduly repetitious or prolonged.

The SLED agents did not make Petitioner any explicit promises of leniency, instead telling Petitioner they would relay his cooperation to the solicitor. Additionally, Agent Johnson never made any misrepresentations to Petitioner about the evidence against him. There is no contention law enforcement threatened or physically punished Petitioner. They did not deprive him of food or sleep, and they asked him if he needed a restroom break.

Moreover, while a parent's presence is not required by law when questioning a minor, Sabb—who was "like a mother" to Petitioner—was present with Petitioner at the outset of the interview with Agents Johnson and Merrell. Although law enforcement asked Petitioner and Sabb if they minded if the SLED agents talked to Petitioner alone, there is no indication in the record that Sabb could not have stayed in the room if either she or Petitioner had insisted upon it. Agent Johnson even

---

1312–13 (collecting cases holding that breaks of between thirty minutes and five hours did not require the readministration of *Miranda* warnings; and explaining that even significant breaks, including a period of up to one week, may not nullify the initial giving of the *Miranda* warnings under certain circumstances); *Ex parte Landrum*, 57 So. 3d 77, 81 (Ala. 2010); *State v. Nguyen*, 133 P.3d 1259, 1274–75 (Kan. 2006) ("[A] waiver does not expire through the mere passage of 5 to 8 hours when a suspect has been in continuous custody."); *In re Tracy B.*, 391 S.C. 51, 68, 704 S.E.2d 71, 79 (Ct. App. 2010) (finding an interval of two hours between the initial *Miranda* warning and the defendant's statement did not require re-mirandizing the defendant).

[15] More specifically, Petitioner arrived at the police station around 3:00 or 4:00 p.m., was mirandized by Chief Williams at 4:56 p.m., and was interviewed by Agents Johnson and Merrell for about one hour, between 6:00 and 7:00 p.m. While Petitioner was not booked into the DJJ until 3:00 a.m., the interview with Agents Johnson and Merrell was concluded by 7:00 p.m., and there is no indication in the record that Petitioner talked to law enforcement about the victim's murder after 7:00 p.m.

confirmed, both before and after Sabb left the room, that Petitioner was comfortable with what had just happened and was still willing to make a statement.

Similarly, Agent Johnson repeatedly reminded Petitioner he could stop talking to them at any time. Petitioner never unequivocally stated he wanted to stop the interview until the end, when it did stop. Rather, at best, Petitioner said he "was tired of doing this" and to "please just lock [him] up," but when Agent Johnson asked him explicitly if that meant he wanted to stop the interview, Petitioner continued to talk and answer questions.

As to the characteristics of the defendant, and looking only at what the trial court knew at the time of the *Jackson* hearing, Petitioner was only fifteen-and-a-half when interviewed and "much smaller" than the SLED agents. However, statements by minors significantly younger than fifteen have been found to be voluntary and admissible,[16] and youth alone does not require exclusion of the confession. Moreover, Petitioner communicated in an understandable way, was in "good physical condition," and did not appear to be under the influence of drugs or alcohol at the time of the interview.

Nonetheless, Petitioner's education level was limited, in part because of his young age and in part because he struggled in school. However, the trial court made a factual finding that Petitioner was "pretty street smart." In support, the trial court explained Petitioner attempted multiple times to convince the SLED agents that he had an alibi.[17] Likewise, Petitioner had a prior juvenile record and was on probation for a violent offense at the time he murdered the victim. Also, Petitioner had enough experience with law enforcement that he knew the names of several Allendale police detectives involved in the case. The trial court concluded that, despite Petitioner's limited formal education, his past experiences with law enforcement and "street smarts" helped to render his confession voluntary. The factual findings regarding Petitioner being "street smart" are supported by "any evidence" and, therefore, must

---

[16] *See, e.g.*, *Pittman*, 373 S.C. 527, 647 S.E.2d 144 (twelve years old); *Smith*, 268 S.C. 349, 234 S.E.2d 19 (thirteen years old); *Tracy B.*, 391 S.C. 51, 704 S.E.2d 71 (fourteen years old); *Christopher W.*, 285 S.C. 329, 329 S.E.2d 769 (eleven years old).

[17] *See, e.g.*, *Pittman*, 373 S.C. at 569–70, 647 S.E.2d at 166 (explaining the twelve-year-old defendant's actions in developing an elaborate alibi tended to show an elevated level of intelligence that offset the otherwise-coercive factors of his youth and immature behavioral issues).

be upheld under our standard of review. With Petitioner's "street smarts" in mind, we find his education and experiences weigh in favor of a finding of voluntariness.[18] In other words, Petitioner was "street smart" enough to understand what was going on and the nature of the rights he was waiving when he decided to talk to the SLED agents.[19]

Perhaps in conjunction with Petitioner's prior law enforcement experiences, Petitioner was relaxed enough during the interview to laugh with Agents Johnson and Merrell about his marijuana usage. Similarly, Petitioner not infrequently interrupted the SLED agents during the conversation to clarify a point or change the topic, not merely following where the SLED agents' questions led the interview. Moreover, when Agent Johnson asked Petitioner if he intimidated him, Petitioner deflected, joking he just had "more respect for females," causing everyone to laugh. It would be somewhat unusual to find a suspect was coerced into confessing while simultaneously laughing and joking with the law enforcement agents who were overbearing his free will.[20]

Thus, as a whole, the facts in this case stand in "stark contrast to the cases in federal or other state courts where courts have set aside convictions because they were based on confessions admitted under circumstances that offended the requirements of due process." *Pittman*, 373 S.C. at 568, 647 S.E.2d at 165 (cleaned up). Accordingly, with respect to Petitioner's due process challenge, we hold Petitioner's confession to Agents Johnson and Merrell was voluntary under the totality of the circumstances.

---

[18] *See Fare*, 442 U.S. at 726; *Christopher W.*, 285 S.C. at 331, 329 S.E.2d at 770.

[19] We say this understanding there is evidence to the contrary that was presented to the trial court, specifically, Jordan's testimony that, during the pre-waiver evaluation with the DJJ psychologist, Petitioner appeared *not* to understand his *Miranda* rights until after they were more fully explained to him. However, based on the standard of review and the deference this Court is required to give the trial court's factual findings and credibility determinations, we find that counterevidence does not overcome the evidence the trial court found credible.

[20] It is also worth noting Petitioner never confessed to his involvement in the Fairfax shooting during the allegedly coercive interviews with Chief Williams and Agents Johnson and Merrell.

**B.**

The second constitutional basis which requires confessions to be voluntarily given is the Fifth Amendment's prohibition of compelled self-incrimination. *Dickerson*, 530 U.S. at 433. In *Miranda v. Arizona*, the Supreme Court recognized that custodial police interrogation, by its very nature, isolates and pressures an individual, thereby blurring the line between voluntary and involuntary statements to law enforcement. 384 U.S. at 439, 455. Driven by a concern that the traditional due-process, totality-of-the-circumstances test risked overlooking involuntary custodial confessions, the Supreme Court set forth the four now-ubiquitous *Miranda* warnings. *Id.* at 457, 467, 479. "The *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions." *Berghuis v. Thompkins*, 560 U.S. 370, 387 (2010).

Petitioner now argues his *Miranda* waiver was involuntary because he did not understand those rights before waiving them. We disagree.

Whether a criminal defendant understood the *Miranda* warnings given to him is a quintessential factual question and, therefore, must be reviewed under the deferential "any evidence" standard of review. Here, the trial court's finding that Petitioner was advised of and understood his *Miranda* warnings prior to being questioned is certainly supported by the evidence.

First and foremost, Chief Williams properly advised Petitioner of his *Miranda* rights before Petitioner was questioned, and Petitioner signed a waiver to that effect. *See Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare."); *Smith*, 268 S.C. at 354, 234 S.E.2d at 21 ("The decisions are voluminous that the signing of a written waiver is usually sufficient" to show an accused "intelligently waived his privilege against self-incrimination.").

Second, despite his youth, Petitioner had already had multiple run-ins with law enforcement in which he was mirandized and had those rights explained to him. In fact, aside from being adjudicated delinquent several times, Petitioner was on probation when he murdered the victim. All of these prior experiences exposed him to the *Miranda* warnings and the concomitant rights associated with being interviewed by law enforcement. *See Fare*, 442 U.S. at 726 (noting that a sixteen-and-a-half-year-old juvenile offender who had been arrested several times in the past and was on probation at the time of a subsequent offense had sufficient intelligence

to understand his *Miranda* rights, waive those rights, and understand the consequence of waiving those rights); *Christopher W.*, 285 S.C. at 331, 329 S.E.2d at 770 (finding voluntary the confession of an eleven-year-old boy in part because the boy had several past encounters with law enforcement in which he had been mirandized and had his rights explained to him, and because he was on probation when he committed the new offense).

As a result, under our deferential standard of review, we conclude there is evidence in support of the trial court's findings that Petitioner was properly mirandized, understood his rights, and had an opportunity to invoke his rights before being interviewed by law enforcement. We therefore find his statements voluntary under the Fifth Amendment.

## IV.

Even were we to find Petitioner's statement to Agents Johnson and Merrell involuntary, it is indisputable that any possible error resulting from admitting Petitioner's involuntary statement was harmless beyond a reasonable doubt. *See State v. Pagan*, 369 S.C. 201, 212, 631 S.E.2d 262, 267 (2006) ("Generally, appellate courts will not set aside convictions due to insubstantial errors not affecting the result. Error is harmless beyond a reasonable doubt where it did not contribute to the verdict obtained. Thus, an insubstantial error not affecting the result of the trial is harmless where guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached." (cleaned up)).

Here, as at trial, Petitioner does not challenge the voluntariness or admissibility of his three other confessions to Capers, Sabb, and Chief Williams. The allegedly involuntary confession to Agents Johnson and Merrell was cumulative in every material respect to the prior three admissible confessions. *See Milton v. Wainwright*, 407 U.S. 371, 372–73 (1972) (explaining the admission of an involuntary confession was harmless beyond a reasonable doubt due to the proper admission of three additional, cumulative confessions). Moreover, Petitioner's confession to Agents Johnson and Merrell was corroborated by direct and circumstantial evidence, the most significant of which (although there was certainly more) was Petitioner's bloody handprint—made with the victim's blood—found on the wall of the living room. *See Fulminante*, 499 U.S. at 301–02 (explaining that, as it related to involuntary confessions, the harmless error analysis may be affected by whether the confession was fully corroborated by direct and circumstantial evidence); *cf. Smalls v. State*, 422 S.C. 174, 191, 810 S.E.2d 836, 845 (2018) (explaining, in the context of post-conviction relief review, that for "evidence to be 'overwhelming' such that it categorically precludes a finding of prejudice . . . the evidence must include

something conclusive, *such as a confession, DNA evidence demonstrating guilt, or a combination of physical and corroborating evidence so strong that the* Strickland[21] *standard of 'a reasonable probability the factfinder would have had a reasonable doubt' cannot possibly be met*" (emphasis added) (cleaned up)).

As a result, even were we to find the fourth confession to Agents Johnson and Merrell was erroneously admitted, the error was harmless beyond a reasonable doubt.

**V.**

As the Supreme Court has previously explained, "A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Fulminante*, 499 U.S. at 296 (cleaned up). Here, Petitioner confessed four times to murdering the elderly victim. Petitioner challenges only the last of his damning confessions. Under a totality of the circumstances, we hold that the final confession was voluntarily given and, thus, admissible. We therefore affirm the decision of the court of appeals.

**AFFIRMED.**

**FEW, JAMES, HILL, JJ., and Acting Justice Kaye G. Hearn, concur.**

---

[21] *Strickland v. Washington*, 466 U.S. 668 (1984).